# EXHIBIT B

LAURA MARQUEZ-GARRETT, SBN 221542
laura@socialmediavictims.org
**SOCIAL MEDIA VICTIMS LAW CENTER**
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Christopher A. Seeger (*pro hac vice* anticipated)
Christopher L. Ayers (*pro hac vice* anticipated)
Nigel P. Halliday (*pro hac vice* anticipated)
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone: 212-584-0700

[Additional counsel appear on signature page.]

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON     9/27/2022
By_____ /s/ Maria Coronel
              **Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| V.P., on behalf of her minor child J.P., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., FACEBOOK HOLDINGS, LLC, FACEBOOK OPERATIONS LLC, FACEBOOK TECHNOLOGIES LLC, AND INSTAGRAM LLC,<br><br>Defendants. | Case No.:  22-CIV-03935<br><br>CLASS ACTION COMPLAINT<br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiffs V.P., on behalf of her minor child J.P., individually and on behalf of a class of all others similarly situated, bring this Complaint against Defendant Meta Platforms Inc. and various subsidiaries ("Meta," "Facebook," or "Instagram"), and state as follows:

## INTRODUCTION

1.        "Facebook connects people. It's what we do. And real connection can only happen on safe and secure platforms. That's why we build technology that gives you more control and helps keep you safe." These words are the opening lines from a television advertisement Meta—the creator of popular social media products Facebook and Instagram—launched earlier this year. As these words are spoken by a voice actor, images of smiling Facebook users—many of whom, like in the screenshot from this advertisement below, appear to be children—flash on screen. The advertisement goes on to identify a number of specific safety features, including "industry leading AI" that represent "tools that can protect—so you can connect."



2.        This is not a new message for Meta. Since the company's initial public offering (and well before), Meta has claimed that Facebook (and later, Meta's Instagram product)(collectively, "Meta Products") "include[s] robust safety tools" and "take[s] into account the unique needs of teenagers who use our service." It has repeated variations of these claims a staggering number of times in a wide variety

of mediums. Over and over again, Meta has claimed that Facebook and Instagram are safe for children and teenagers to use because of the company's algorithmic and non-algorithmic safety tools.

3.     Meta has also claimed repeatedly that Facebook and Instagram are not designed to produce compulsive behavior in children. For example, in or around July 2018, Meta told BBC News that "at no stage does wanting something to be addictive factor into" its product design process. Similarly, Meta told U.S. Senators in November 2020 that "we certainly do not want our products to be addictive."

4.     Meta's claims could not be further from the truth. A series of recent bombshell revelations from whistleblowers and government investigators have revealed that Meta intentionally designed and developed their products to work in ways that Meta knew to be problematic for and highly detrimental to their minor users' mental health. Further, Meta designed its products this way because it understood that these product features helped make its products more habit-forming—compelling its users to maximize screen time. In Senate hearings following these revelations, U.S. Senator Richard Blumenthal remarked on the "striking" similarities between these disclosures and the discovery of Big Tobacco's decades long conspiracy to deceive the American public about the health effects and addictiveness of cigarettes.

5.     Meta's misrepresentations and omissions have made it billions. Meta profits from targeting advertisements at its users, including children. These representations have induced children to use (and their parents and guardians to permit such use of) Facebook and Instagram when they either would not have otherwise, or would have reduced the amount of time spent on Facebook and Instagram to safeguard against these health concerns. Internal documents disclosed by whistleblowers have revealed that Meta views "acquiring and retaining" teens as essential to the company's survival and continued growth.

6.     Surveys indicate that forty-five percent of children older than nine but under the age of thirteen use Facebook on a daily basis—despite the fact that federal law prohibits sites like Facebook from having users under the age of thirteen. The same survey evidence indicates forty percent of children older

than nine but under the age of thirteen use Instagram. This is possible because Facebook and Instagram have no meaningful identity verification requirements—meaning children can create a Facebook or Instagram account simply by lying about their age. Facebook has been aware for more than a decade that children under the age of thirteen are using its sites because of its lack of any identity verification system. Indeed, it has studied and even spoken with some of these children—and even Mark Zuckerberg, Meta's founder, has publicly acknowledged he is aware that children under the legal age are on Facebook and Instagram. But it has chosen not to change its policies.

7.     These revelations have also shone new light on Meta's longstanding practice of basing fundamental characteristics of its products—Facebook and Instagram's Newsfeed feature—on user gender. Gender is a key datapoint in the algorithms Meta uses to control its newsfeeds, as are proxies for gender and other datapoints generated as a result of Meta's use of gender in its newsfeeds. Users thus receive a fundamentally different experience based on their gender when using Facebook and Instagram. Whistleblower revelations show that Meta's newsfeeds perniciously reinforce gender stereotypes regarding appearance and body image, to users of all genders—though with particularly devastating effects on pre-adolescent girls. These revelations show that just as gender discrimination in the physical world produces devastating consequences, discrimination in the digital world can produce the same (or even worse) harms.

8.     Plaintiffs bring this class action to hold Meta accountable for its misconduct. Plaintiffs bring (1) a nationwide unjust enrichment class claim individually and on behalf of all persons in the United States under the age of thirteen who have Facebook or Instagram accounts and have used those accounts for an for at least twenty-five hours at the time of class certification, (2) a nationwide California Unruh Civil Rights Act claim on behalf of all persons under the age of thirteen who have Facebook or Instagram accounts and have used those accounts for at least twenty-five hours at the time of class certification and

(3) subclass claims under the state consumer protection laws of Colorado, the District of Columbia, Hawaii, Idaho, Indiana, Kansas, Michigan, New Hampshire, New York, Ohio, Oklahoma, Utah, and Virginia on behalf of all persons in each state or territory under the age of thirteen who have Facebook or Instagram accounts and use those accounts for at least twenty-five hours at the time of class certification.

9.      The nationwide unjust enrichment class claim seeks to force Meta to disgorge its wrongfully obtained profits from advertisements directed at child users. Settled principles of unjust enrichment law prohibit Meta from profiting from its own tortious conduct directed at children.

10.     The nationwide Unruh Act claims seeks to hold Meta accountable for building its products in ways that inherently discriminate against all of its users—of all genders—based on their gender. For decades, California law has recognized that businesses cannot engage in differential treatment based on gender—precisely because such conduct can cause profound harms. But Meta chose to build its business empire based on gender discrimination—to build products that discriminate by design. This conduct has produced profound harms, in much the same way that discrimination in the brick and mortar world produces profound harms.

11.     The state consumer protection class claims seek to hold Meta accountable for systematically misrepresenting the safety of its products by imposing either statutory damages set by state consumer protection law or actual damages as measured through expert proof.

12.     This is not an action to recover relief for personal injuries inflicted by Meta's Facebook or Instagram products. Any such claims are expressly excluded from this action and this suit has no effect on any class member's ability to bring such claims. Any person who has or will prior to the date of class certification file a claim for personal injury related to the Facebook or Instagram products is excluded from this class.

**PARTIES**

13.    Plaintiff V.P. is a citizen of Washington State and the mother of 12-year-old minor J.P., on whose behalf she brings these claims.

14.    Defendant Meta is a Delaware corporation with its principal place of business in Menlo Park, California. Meta owns and operates the Facebook and Instagram social media products, which are widely available to users throughout the United States.

15.    Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Technologies, LLC, and Instagram, LLC are each limited liability companies wholly owned by Meta.

**JURISDICTION AND VENUE**

16.    This Court has general personal jurisdiction over Meta because its headquarters is located in Menlo Park, California. In addition, it has specific personal jurisdiction over Meta because Meta purposely availed itself of this forum by maintaining its headquarters and much of its product design operations in this forum and because those forum contacts are causally related to Plaintiffs' claims.

17.    Venue is proper because Meta is headquartered in Menlo Park, California, in this County.

**FACTS**

18.    The human brain is a network of cells that communicate with one each other using chemicals called neurotransmitters. These cells are themselves organized into structures or sets of structures, which play different roles in cognition. Two of the most important sets of structures within the brain are the limbic system—which regulates a variety of functions including the emotional processing of sensory systems—and the prefrontal cortex, which regulates executive function, judgment, and self-regulation.

19.    Beginning between the ages of ten and twelve and continuing throughout adolescence, the limbic system develops into maturity before the prefrontal cortex. As the limbic system develops,

increased levels of neurotransmitters associated with rewards—like dopamine and serotonin—circulate in the limbic system. These changes make adolescents and pre-adolescents (a term for children in this critical stage of development) more emotional, more responsive to rewards, and more susceptible to boredom.

20.     Because the prefrontal cortex develops to maturity well before the limbic system, adolescents and pre-adolescents are prone to engage in thrill-seeking behavior without regard to the consequences of that behavior. Some experts on child development compare the effects of this phased development as being like if a car's engine suddenly became more powerful without a braking system yet being installed.

21.     This change in brain chemistry has significant effects on pre-adolescent social behavior. All humans have a deep seated need for belonging, community, and social validation. This deep seated need manifests in the release of neurotransmitters whenever humans receive social rewards. But pre-adolescents are particularly focused on obtaining social validation because of their increased susceptibility to thrill-seeking behavior, and because they have not yet developed the sense of self and community bonds that adults can rely upon to compensate in times of loneliness or isolation.

22.     Children's brains are also different from adult brains because of their unusual neuroplasticity. Adolescents and pre-adolescents are more able to learn new behaviors—whether positive or negative—than adults. In some circumstances, this trait can be positive—the enhanced neuroplasticity of pre-adolescent brains is what makes pre-adolescents better able to learn foreign languages than adults, for example. In other circumstances though, this neuroplasticity means pre-adolescents are more susceptible to forming unhealthy patterns of behavior, engage in compulsive behavior, or develop addiction.

23.     Precisely because pre-adolescents are more likely to engage in dangerous behaviors when presented with stimuli that elicit thrills or other positive mental reactions, both the law and social norms

have developed to shield this vulnerable group from certain kinds of products that are likely to induce destructive behavior in them. Pre-adolescents are thus restricted from purchasing alcohol, cigarettes, purchasing movies or videogames with certain types of violence or sexual content, gambling, or engaging in any number of other activities where participants must be able to exercise self-control in the face of positive stimuli.

24.     But where the rest of society saw a danger to be protected against, Meta saw an opportunity. Meta realized that the features of the pre-adolescent brain that make them vulnerable could be harnessed to make pre-adolescents use Facebook and Instagram more and more—increasing the products' profitability. And so Meta built features into its Facebook and Instagram products that were designed to provide rewards to users in intermittent and variable ways—similar to the function of a slot machine. Those intermittent and variable rewards were paired with a design that would feed users a literally unending stream of content and with algorithmic tools to maximize user engagement. And Meta was careful to ensure its platform had no means for parents to be able to limit their children's engagement with Facebook or Instagram or for users to protect themselves from the effects of this platform.

25.     Today, Facebook is a social media product with approximately three billion users worldwide. Facebook is the third most visited website in the world. And Facebook makes billions in revenue by selling advertisements, which are displayed to the site's users. These vast streams of money have made Mark Zuckerberg, Meta's founder, one of the richest men in the world.

26.     Meta's Instagram product has approximately one billion users worldwide and is the sixth most visited website in the world. Meta acquired Instagram in 2012, as part of a deliberate effort to maximize its market share of adolescent social media users after Meta's Facebook product saw a slight decline in adolescent users in the same year. It, too, is a source of vast wealth for both Meta and Mark Zuckerberg.

---

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL - 8

27.     These profits are only possible because of the users of Meta's Facebook and Instagram products—without users, Meta could not profit from the sale of advertisements. Importantly, the relationship between Facebook and its users (and Instagram and its users) is a consumer transaction— Meta sells its users access to the Facebook product (or the Instagram product) in exchange for the opportunity to show those users advertisements.

28.     The link between user engagement with Facebook and Instagram and its profitability is one Meta itself has acknowledged. In multiple Form 10-Ks, Meta has acknowledged that "[t]he size of our user base and our users' level of engagement are critical to our success." Because of this, Meta's "financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users."

29.     As with other consumer transactions, prospective Facebook and Instagram users base their decision about whether to use Facebook or Instagram on their understanding of the features of the product, particularly their understanding of whether the product is safe. Meta itself has acknowledged this. For example, in multiple Form 10-Ks, Meta has noted that "[i]f people do not perceive our products to be useful, reliable, and trustworthy, we may not be able to attract or retain users or otherwise maintain or increase the frequency and duration of their engagement." "Any decrease in user retention, growth, or engagement could render Facebook less attractive to developers and marketers, which may have a material and adverse impact on our revenue, business, financial condition, and results of operations." And "changes in user sentiment about the quality or usefulness of our products or concerns related to privacy and sharing, safety, security, or other factors" could "potentially negatively affect user retention, growth, and engagement." Because of the importance of user perception of the qualities of the Facebook product, including regarding safety, Facebook observed in its 2012 Form 10-K that user "[t]rust is the cornerstone of our business."

30.     Meta's efforts to exploit the pre-adolescent market of social media users began as early as 2006, when the company dramatically expanded the population of users it was willing to provide access to its product. Prior to 2006, Meta limited access to Facebook to college students, and insisted that college students provide a .edu email address to verify their status before they could use the Facebook product. This simple policy provided an effective barrier against minors using Facebook.

31.     In 2006, Meta eliminated the .edu email requirement and changed its policies to formally permit users as young as thirteen to use the Facebook product. In theory, Facebook required users under the age of eighteen to obtain parental permission before using Facebook. But in practice, the elimination of any meaningful identity verification requirement meant that users younger than thirteen or who did not have parental permission could easily obtain access to Facebook by lying about their age or whether they had parental permission. This absence of meaningful age or identity verification continues to the present.

32.     Almost immediately, children and adolescents began joining Facebook in droves. In October 2007, Reuters reported that teenagers were "one of the biggest groups using social network sites" like Facebook. In August 2008, The Guardian reported that nearly a quarter of children between the ages of eight and twelve in the United Kingdom had social media accounts on either Facebook or two competitor platforms. As noted above, this state of affairs continues today—survey evidence indicates staggering numbers of children under the age of thirteen use Facebook on a daily basis. Meta's own evidence and internal documentation confirms the same.

33.     As the number of children and adolescents on Facebook grew, so did their engagement with the platform. An FTC Commissioner testified in June 2006 that "MySpace and Facebook reportedly rank among the top ten websites among children age 12 to 17, based on the average minutes they spent online."

34.     The presence of children under the age of thirteen on Facebook and Instagram is particularly significant because federal law prohibits websites from gathering user data from children under the age of thirteen unless the website complies with a set of stringent safety requirements. 15 U.S.C. § 6502. Facebook has never attempted to comply with those safety requirements.

35.     This provision of federal law was enacted precisely because Congress recognized that children under the age of thirteen are particularly vulnerable to being taken advantage of by unscrupulous website operators. As a June 1998 report by the Federal Trade Commission observed, "[t]he immediacy and ease with which personal information can be collected from children online, combined with the limited capacity of children to understand fully the potentially serious safety and privacy implications of providing that information, have created deep concerns about current information practices involving children online." The same report observed that children under the age of 13 "generally lack the developmental capacity and judgment to give meaningful consent to the release of personal information to a third party."

36.     Contemporaneous testimony by the Chairman of the Federal Trade Commission observed that the Internet "make[s] it easy for children to disclose personal information to the general public without their parents awareness or consent. Such public disclosures raise safety concerns." Further, "[t]he practice of collecting personal identifying information directly from children without parental designs clear his children strains invents parental control over their family information." 15 U.S.C. § 6502 was enacted precisely to respond to these serious threats to children and families' privacy. It has remained in force throughout Facebook's existence.

37.     In spite of the law, Facebook encouraged the growth of child and adolescent users on its platform. As the New York Attorney General's office explained in a September 2007 letter "Facebook prominently advertises and promises to users that Facebook is a 'trusted environment for people to interact safely,' has 'invested heavily in building safety controls,' and 'quickly takes down any objectionable

material that may be posted to the site.'" The same letter noted that Facebook made these representations on a "'Safety' page on its website specifically created to address the security and privacy concerns of Facebook users and parents."

38.     Beyond its webpage, the New York Attorney General's office's 2007 letter noted that Facebook executives had claimed to the public and consumers that "Facebook protects users under 18 by preventing adults from contacting them if the adults are not affiliated with a specific school network" and that "the system is built for accountability with its email validation requirement and segmentation of communities [meaning] misuse is both deterred and detected quickly."

39.     As the same letter noted, those claims were not true—investigators with the New York Attorney General's office discovered that users under 18 could easily be contacted by adults, frequently were solicited for sexual material, and were routinely exposed to harmful material on the product. Facebook also faced other government investigation related to the harms its product caused children at the same time.

40.     In the face of evidence its platform was causing harm to children, Facebook doubled down—it created product features that would appeal to pre-adolescents' desires for rewards, increasing their engagement with the Facebook product.  At the same time, it continued its marketing of its product as being safe for minor users, touting purported safety tools that offered little actual protection to users.

41.     In 2009, after extensive testing, Facebook created the "Like" button. The "Like" button allows users to click on other user's posts in a way that triggers a thumbs up icon to appear. The number of "Likes" a given post has received is publicly displayed. At all relevant times, Meta's Instagram product has also included a "Like" feature, which functions in materially the same way as Facebook's "Like" feature, except that a heart icon is used instead of a thumbs up icon.

42.     The "Like" button fundamentally transformed the nature of interactions on the Facebook product. Suddenly, users were able to earn rewards—in the form of social validation through "Likes" from their peers—for posting on Facebook or Instagram. Those rewards would be both intermittent and variable—some posts would get more "Likes" and some would get less. Users could see whose posts got more "Likes" and whose got less. Facebook and Instagram's "Like" feature allowed it to tap into the deep-seated need for the reward of social validation, particularly acute in adolescents, and tie it to engagement with the Facebook and Instagram products.

43.     In the words of Samira Rajabi, the director of technology influenced pedagogy at the University of Colorado, Boulder, "Likes" generate a feeling of reward because "[i]t feels good to put yourself out there. It then gets curtailed by this sort of attention economy dynamic where nobody might respond or like it or engage with it, and in that way, it becomes a competition." Similarly, Mitch Prinstein, the chief science officer of the American Psychological Association, has observed that "social media activity is closely tied to the ventral striatum" precisely because "this region gets a dopamine and oxytocin rush whenever we experience social rewards."

44.     The corollary of the propensity of "Likes" to serve as a reward is that a lack of "Likes" represents a form of social rejection—a quantifiable indication that a pre-adolescent is less well regarded than their peers, or not as popular, or well-liked. As recent peer-reviewed psychological research found "insufficient validation on social media [is] a brief yet powerful emotional event that threaten[s] adolescents' social status and elicit[s] emotional distress." The same study found that "rejection feelings arising from insufficiently positive validation during a brief social media interaction were correlated with ecologically-valid risk factors for depression in adolescence (maladaptive day-to-day stress appraisals) and greater increases in depressive symptoms over 8 months."

45.     Meta's internal research on adolescent users has confirmed exactly this. As revealed by the slides below, drawn from multiple studies conducted by Meta, each of which have been disclosed by whistleblowers to the media, Meta's user research has identified "the need for validation" in the form of "likes" as being a way "that Instagram harms [teen users'] mental health[.]" The broader universe of social comparison harms enabled and furthered by the "Like" feature—including "pressure to conform to social stereotypes," and "pressure to match the money and body shapes of influencers [users who routinely obtain a large number of "Likes"]," have also been linked by Meta's internal research as creating harm to adolescent users. As Meta's own research observes, the consequences of this to adolescent mental health can be severe.





**Why? Frequent social comparison is a key driver of subjective well-being and teens say IG makes this problem worse.**

# 66%

of teen girls on IG experience negative social comparison (compared to 40% of teen boys)

# 52%

Of teen girls who experienced negative social comparison on Instagram, said it was caused by images related to beauty

# 32%

of teen girls said that when they felt bad about their bodies, Instagram made them feel worse

**Teens blame Instagram for increases in the rates of anxiety and depression among teens**

- This reaction was unprompted and consistent across all groups
- Constant comparison on Instagram is "the reason" why there are higher levels of anxiety and depression in young people
- Social comparison and perfectionism are nothing new, but young people are dealing with this on an unprecedented scale.
- The proliferation of new and different ways to compare themselves to others, combined with constant access to means that there is no way to escape social comparison on IG.
- For both boys and girls, this was called out as being the number one reason why IG is worse than other platforms for mental health. And, young people openly attribute their increased level of anxiety and depression to Instagram.

*"The reason why our generation is so messed up and has higher anxiety and depression than our parents is because we have to deal with social media. Everyone feels like they have to be perfect."*
*- UK Female*

46.    This research on adolescent users informed (or should have informed) Meta's understanding of the effects of its products on pre-adolescent users. The changes in brain chemistry that make adolescents vulnerable to the social comparison and other related harms identified in this research occur in pre-adolescence. Mounting evidence that Meta's products caused harm to adolescents thus spoke powerfully to the effect of Meta's products on pre-adolescent users

47.     Beyond the social comparison harms created through the "Like" feature, the "Like" feature also provides intermittent and variable rewards—which because of their underdeveloped frontal lobes, adolescents are particularly susceptible to. Engineers involved with designing the "Like" button have likened its intermittent and variable rewards to those of a slot machine. Indeed, the lead engineer behind the "Like" button has since criticized the addictive feedback loops associated with the "Like" feature, and uses browser extensions to block her own access to the Facebook site because she found her own use of Facebook had become compulsive. Other engineers involved with the development of the "Like" feature have publicly criticized the feature's effects on user behavior.

48.     The "Like" button was also transformative because it allowed Facebook to see what kinds of content more users engaged with—information the company could then use to target its users with more of that kind of content. "Likes" thus function as a form of social surveillance.

49.     In a 2017 interview with Axios, a media company, Sean Parker, Meta's first President, explained how Meta's development of this feature (and of its Facebook product more broadly) was consciously driven by a desire to induce addiction or compulsive use in Facebook users. As Mr. Parker explained:

> The thought process that went into building these applications, Facebook being the first of them, to really understand it was all about: "How do we consume as much of your time and conscious attention as possible?" And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content, and that's going to get you, you know, more likes and comments. It's a social-validation feedback loop that that it's exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators — it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's all of these people — understood this consciously. And we did it anyway.

50.     "God only knows what it's doing to our children's brains," Mr. Parker went on to remark in the same interview.

51.     The "Like" button's function as a surveillance tool laid the groundwork for Meta's next dangerous product change—the development of the algorithmic unlimited News Feed.

52.     Facebook's News Feed feature ranks available content and prioritizes content that its algorithms assess users are most likely to engage with. This has the effect—as Facebook quickly realized—of promoting content that it likely to generate strong reactions, because such content is more likely to prompt user engagement. Both Facebook and Instagram have algorithmically controlled newsfeeds. Instagram supplements this newsfeed feature with a number of additional algorithmically controlled feeds which function similarly.

53.     Testing regarding Meta's Instagram product—which like the Facebook product uses an engagement based algorithmic feed—demonstrates how this structure quickly produces disturbing results. In 2021, Senators Richard Blumenthal, Marsha Blackburn and Mike Lee tested Instagram's newsfeed by opening certain accounts indicating that the users were teenage girls. NPR reported what the Senators found:

"Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."

Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."

The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.

In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.

According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.

Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.

"We will correct that," he said.

54.    The algorithmic newsfeed exacerbates the social comparison harms created by Facebook and Instagram's "Like" features. As Meta's internal research has revealed, the combination of these (and other) features "create[s] a perfect storm" encouraging the social comparison phenomenon its own research has identified as being particularly harmful.



55.     In testimony before Congress in September 2020, Tim Kendall, Facebook's first Director of Monetization explained how this combination of features—and Facebook's broader business mode—mirrored the tactics uses by Big Tobacco to addict users to its products:

At Facebook, I believe we sought to mine as much human attention as possible and turn it into historically unprecedented profits. To do this, we didn't simply create something useful and fun; we took a page from Big Tobacco's playbook, working to make our offering addictive at the outset….

The next page in Big Tobacco's playbook was to add bronchodilators to cigarettes. This allowed the smoke to get in contact with more surface area of the lungs. Allowing for misinformation, conspiracy theories, and fake news to flourish were Facebook's bronchodilators.

But that incendiary content wasn't enough. Tobacco companies then added ammonia to cigarettes to increase the speed with which nicotine traveled to the brain. Facebook's ability to deliver this incendiary content to the right person, at the right time, in the exact right way—through their algorithms—that is their ammonia. And we now know it fosters tribalism and division.

Social media preys on the most primal parts of your brain; it provokes, it shocks, and it enrages….

Facebook and their cohorts worship at the altar of engagement and cast other concerns aside, raising the voices of division, anger, hate, and misinformation to drown out the voices of truth, justice, morality, and peace.

56.     As Senator Blumenthal observed in Senate hearings on Meta's conduct:

Among other revelations, the information that you have provided to Congress is powerful proof that Facebook knew its products were harming teenagers. Facebook exploited teens using powerful algorithms that amplified their insecurities and abuses through what it found was an addict's narrative. There is a question, which I hope you will discuss, as to whether there is such a thing as a safe algorithm. Facebook saw teens creating secret accounts that are often hidden from their parents as unique value proposition. In their words, a unique value proposition. A way to drive out numbers for advertisers and shareholders at the expense of safety, and it doubled down on targeting children pushing products on **pre-teens not just teens, but pre-teens** that it knows are harmful to our kids' mental health and wellbeing.

Instead of telling parents, Facebook concealed the facts, it sought to stonewall and block this information from becoming public, including to this committee when Senator Blackburn and I specifically asked the company. And still, even now, as of just last Thursday, when a Facebook witness came before this committee, it has refused this disclosure or even to tell us when it might decide whether to disclose additional documents. And they've continued their tactics, even after they knew the disruption it caused it. Isn't just that they made money from these practices, but they continued to profit from them. Their profit was more important than the pain that they caused.

Last Thursday, the message from Ms. Antigone Davis, Facebook's Global Head of Safety was simple, "This research is not a bombshell." and she repeated the line, not a bombshell. Well, this research is the very definition of a bombshell. Facebook and big tech are facing a big tobacco moment, a moment of reckoning, the parallel is striking. I sued big tobacco as Connecticut's attorney general, I helped to lead the states in that legal action and I remember very, very well, the moment in the course of our litigation when we learned of those files that showed not only that big tobacco knew that its product caused cancer but that they had done the research, they concealed the files, and now we knew and the world knew. And big tech now faces that big tobacco jaw dropping moment of truth. It is documented proof that Facebook knows its products can be **addictive and toxic to children**. And it's not just that they made money, again, it's that they valued their profit more than the pain that they caused to children and their families.

57.     Similarly, Frances Haugen, a former Facebook data scientist, observed in media interviews in 2021 that ""[t]he thing I saw at Facebook over and over again was there were conflicts of interest between what was good for the public and what was good for Facebook. And Facebook, over and over again, chose to optimize for its own interests, like making more money" and repeatedly "has shown it

chooses profit over safety." Ms. Haugen noted that "Facebook has realized that if they change the algorithm to be safer, people will spend less time on the site, they'll click less ads, [and] they'll make less money."

58.     This conduct was targeted at pre-teens in particular. Whistleblower documents reported by the Wall Street Journal reveal that "Facebook has made what it called 'big bets' on designing products that would appeal to preteens across its services," including by conducting "more than a dozen studies" over the past five years regarding how preteens perceive the Facebook and Instagram products, what product features are appealing to them, and how they view competitor products.

59.     Meta's ability to analyze the preferences and desires of pre-adolescent users is unsurprising—the company has vast troves of information to be able to identify which of their users are children. For example, Meta's products contain some of the most sophisticated facial recognition algorithms ever created—capable, for example, of identifying if one of the billions of users of its products is present in a photograph even if the person who posted the photograph is not connected to the user on Facebook. This sophisticated analysis allows Facebook to identify users based on age—including those users under the age of thirteen. Facebook is also able to identify users under the age of thirteen through its sophisticated analysis of user activity and content posted by users. Meta also routinely purchases information about users from data brokers, including information about user age. Meta also collects countless data points from its users both on and off its product platform and has developed proprietary algorithms that it uses to determine the actual age of each user with reasonable certainty. Meta uses these technologies for marketing and advertising purposes but disregards this actual and constructive knowledge of users under 13 when it comes to enforcing age restrictions. Meta permits millions of users under the age of thirteen to use Facebook and Instagram.

60.     These revelations from whistleblower, former Facebook insiders, and congressional investigations make clear that Facebook's algorithms are dangerous to user safety and wellbeing—particularly pre-adolescents. Yet Meta has continued to advertise its algorithms as being safety tools that protect users—despite extensive evidence that this is simply not the case.

61.     Meta's development of algorithmic newsfeeds also launched the beginning of purposeful gender discrimination in the Facebook and Instagram products.  Meta boasts that its algorithmic newsfeed evaluates hundreds of thousands of different datapoints—what the company calls signals—when creating Facebook and Instagram's respective newsfeeds. But the company is far more coy in acknowledging that one of those datapoints is user gender. On information and belief, many other datapoints used in Meta's algorithms are proxies for user gender. Meta collects user information regarding gender when users create Facebook and Instagram accounts. Meta's vast ability to collect demographic information from its users allows it to determine user gender when users do not provide this information. Meta also purchases information about user gender from data brokers.

62.     The experiment conducted by Senators Richard Blumenthal, Marsha Blackburn and Mike Lee described above provides a powerful illustration of how Meta's use of gender in its algorithmic newsfeeds fundamentally shapes users' experiences on these products. It also highlights an important point about the nature of Meta's use of gender—that gender plays a particularly important role in shaping user experience of Meta's products early on, when the company has far fewer other datapoints related to user activity to base its algorithms on. The effect of this is that later datapoints generated based on user activity were generated as a result of engagement that would not have occurred absent earlier algorithmic targeting decisions based on gender—the later datapoints are inherently infused with gender.

63.     The effect of Meta's choice to include gender as a basis for its algorithmic tailoring, to use proxies for gender as a basis for its algorithmic tailoring, and to use datapoints inherently infused with

gender as a basis for its algorithmic targeting is that each and every time users open the Facebook or Instagram products, the newsfeeds they see are always determined based on user gender.

64.    One need look no further than the Meta internal studies discussed above on social comparison harms to understand the consequences of this gender discrimination. A striking number of the harms identified by Meta's internal research connect back to the product's reinforcement of social stereotypes related to gender—particularly those related to body image and appearance. As discussed above, these harms affect users of all genders. Such harms are the obvious and foreseeable consequence of building a product that discriminates by design based on gender.

65.    The scientific community has increasingly come to understand the health effects of Meta's Facebook as being analogous to other addictive products. For example, the Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists to assess subjects' social media use using the aforementioned addiction criteria and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages and is used by researchers throughout the world to measure social media addiction.

66.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

(a)    You spend a lot of time thinking about social media or planning how to use it.

(b)    You feel an urge to use social media more and more.

(c)    You use social media in order to forget about personal problems.

(d)    You have tried to cut down on the use of social media without success.

(e)    You become restless or troubled if you are prohibited from using social media.

(f)    You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

67.     Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically similar to social media addiction.

68.     The increasing trend by psychologists and researchers to term compulsive use of social media addiction is supported by Facebook's internal research. In November 2021, the Wall Street Journal reported that internal Facebook research on its users revealed that one in eight Facebook users reported engaging in compulsive use of social media that impacts their sleep, work, parenting, or relationships. The Journal reported that Meta uses a euphemism to describe this kind of behavior—"problematic use."

69.     Following the Wall Street Journal's report, Meta doubled down once again on its misrepresentations, publishing a vitriolic attack on the Journal's reporting that denied the existence of a "causal link between social media and addiction" and claimed that "social media does not have a major detrimental impact on well-being."

70.     In December 2021, the Surgeon General of the United States issued an Advisory, *Protecting Youth Mental Health*. This was a significant step: "A Surgeon General's Advisory is a public statement that calls the American people's attention to an urgent public health issue and provides recommendations for how it should be addressed." "Advisories are reserved for significant public health challenges that need the nation's immediate awareness and action."

71.     The Advisory identified "alarming increases in the prevalence of certain mental health challenges" among young people—including a 40% increase in "feelings of sadness or hopelessness" from the year 2009. It linked this decline to "technology platforms" and noted that "[b]usiness models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways." "This translates to technology companies focusing on maximizing time spent, not time well spent." The Surgeon General thus called upon young people, their family members, and social media companies to take steps to protect the mental health and wellbeing of young people using their platforms. The Surgeon General's Advisory specifically cited to research regarding the Facebook product's effects on adolescent and pre-adolescent wellbeing.

72.     In the face of this call to act responsibly, Meta did not meaningfully alter its Facebook or Instagram products. It instead launched an advertisement campaign emphasizing how purported algorithmic safety tools protected users and meant Facebook was safe for children to use. One of the several television advertisements Facebook ran as part of this campaign is featured at the beginning of this complaint.

73.     Meta's false and misleading statements regarding the safety of its platform are not limited to those made in its television advertisements. For example, Facebook's Code of Conduct, available on Facebook's website and published as part of Meta's public relations response to adverse publicity, states that "[o]ur reach and influence require that we commit and hold ourselves accountable to a high standard, ensuring that we build products and programs that have a positive impact, keep people safe and serve everyone." The Code of Conduct also stated that one of Facebook's five core principles is to "keep people safe and protect privacy" and emphasized that "we are committed to protecting our communities from harm."

74.     Facebook's Code of Conduct further claims that Meta "design[s] and build[s] products that prioritize safety, privacy, provide appropriate warnings where necessary and articulate instructions for safe and responsible use."

75.     Likewise, Mr. Zuckerberg claimed in a recent media interview that "as a product designer a big part of what you are designing is the emotional experience people have using it" and that "Instagram is a super positive space," "the energy on Instagram is generally very positive and its easy to spend time there and just absorb a lot of the positivity." Mr. Zuckerberg claimed that this occurred because of "the design of the [Instagram] system."

76.     Similarly, a senior Facebook executive publicly claimed in early 2021 that "more than anyone else in the industry we invest on the safety and security side to sort of keep bad content off the site before it gets ranked and put into what people see." The same executive claimed Facebook has "the most robust set of content policies out there" and "we really do more than anyone else in the industry on the safety and security front to prevent things like misinformation and bad content going into the system in the first place."

77.     These recent false statements reinforce Facebook's longstanding marketing of its product as being safe for children—marketing that, as described above, stretches back since the product opened its site to children by removing its .edu verification requirement.

78.     Meta's recent advertisements have also actively encouraged children to use its Facebook and Instagram products. For example, in a 2021 online advertisement, Meta actively highlighted the content available for fifth grade children on its Facebook product, highlighting the experience of an art teacher who used Facebook to communicate with students during the pandemic—an experience the video noted was "a lot to unpack for little, tiny people."



79.     Meta's decision to double down on its misrepresentations about safety and to expand its advertising campaigns directed at children is the product of a corporate culture that until very recently has been insulated from meaningful social or legal accountability.

80.     The experience of the class representative shows just how serious the consequences of Meta's conduct are. Around the age of ten, J.P. began accessing the Meta Products without her parents' knowledge or consent. When V.P. discovered J.P was using the Meta Products, she forbade J.P. from accessing the Meta Products. J.P. quickly created another account on the Meta Products. When V.P. discovered that account, she shut it down as well and took J.P.'s phone away. But J.P. continues to attempt to use the Meta products. J.P. sneaks to the family computer in the late night, often at midnight or 2 A.M. in the morning, to attempt to use the Meta Products. V.P. believes that J.P. also accesses the Meta Products while visiting friends—but V.P. cannot effectively prevent J.P. from accessing the Meta Products in this way without imposing draconian restrictions on her daughter.

81.     Despite V.P.'s prompt and dilligent action to protect her daughter, serious harm had already been done. Since using the Meta Products, J.P. has developed troubling body image issues. For example,

J.P. has said that when she grows up, she want to become a plastic surgeon, so she can correct the ways J.P. believes her body is flawed. In the many conversations V.P. has had with her daughter about these body image issues, the Meta Products, and the stereotypes about body image reflected in their newsfeeds, have been a consistent theme.

## CLASS ACTION ALLEGATIONS

82.     Pursuant to Cal. Code Civ. Pro. § 382, Plaintiffs seek certification of the following classes and subclasses: (1) a nationwide unjust enrichment subclass on behalf of all persons under the age of thirteen who have Facebook or Instagram accounts and have used those accounts for at least twenty-five hours at the time of class certification and (2) a nationwide Unruh Civil Rights Act subclass on behalf of all persons under the age of thirteen who have Facebook or Instagram accounts and have used those accounts for at least twenty-five hours at the time of class certification and (3) subclass claims under the state consumer protection laws of Colorado, the District of Columbia, Hawaii, Idaho, Indiana, Kansas, Michigan, New Hampshire, New York, Ohio, Oklahoma, Utah, and Virginia on behalf of all persons under the age of thirteen who have Facebook or Instagram accounts and have used those accounts for at least twenty-five hours at the time of class certification.

83.     The nationwide unjust enrichment class is defined as follows: All persons under the age of thirteen who have Facebook or Instagram accounts and have used those accounts at least twenty-five hours at the time of class certification.

84.     Plaintiff reserves the right to amend this class definition over the course of the case as informed by discovery. Plaintiff anticipates that discovery will reveal Meta has developed more sophisticated, tailored, and targeted metrics to identify those users engaged in harmful use of its products and can identify those users based on the data it collects.

85.     The nationwide Unruh Civil Right Act class is defined as follows: All persons under the age of thirteen who have Facebook or Instagram accounts and have used those accounts for at least twenty-five hours at the time of class certification.

86.     Plaintiff reserves the right to amend this class definition over the course of the case as informed by discovery. Plaintiff anticipates that discovery will reveal Meta has developed more sophisticated, tailored, and targeted metrics to identify those users engaged in harmful use of its products and can identify those users based on the data it collects.

87.     The subclass claims are defined as follows: All persons under the age of thirteen in each Subclass State who have Facebook or Instagram accounts and have used those accounts for at least twenty-five hours at the time of class certification.

88.     Plaintiff reserves the right to amend this class definition over the course of the case as informed by discovery. Plaintiff anticipates that discovery will reveal Meta has developed more sophisticated, tailored, and targeted metrics to identify those users engaged in harmful use of its products and can identify those users based on the data it collects.

89.     Excluded from each of these classes or subclasses are all claims for personal injury related to Meta's products and all persons who have or will in future prior to the date of class certification bring claims against Meta for personal injury. This suit does not affect in any way the right of any class member at any point to bring an action against Meta for harms suffered in personal injury because of the defective features of the Facebook product, Instagram product, or any other Meta product. Any person who has brought such a claim or who will bring such a claim in future prior to the date of class certification is excluded from the class. Also excluded from the classes or subclasses are Meta and its subsidiaries and affiliates, all persons who make a timely election to be excluded from the classes or subclasses, governmental entities, the Judge to whom this case is assigned and their immediate family, all chambers

staff working for the Judge to whom this case is assigned and their immediate family, and Plaintiffs' counsel and their immediate families. Plaintiffs reserve the right to revise these classes or subclasses based on information learned through discovery or as is otherwise appropriate.

90.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

91.     This action has been brought and may be properly maintained on behalf of the classes or subclasses proposed herein under California Code of Civil Procedure §384.

92.     **Ascertainability**: Cal. Code Civ. Pro. § 382: Both the nationwide class and state subclasses are readily ascertainable. Plaintiffs may be ascertained from Meta's books and records and through expert proof. All class members share a common cause of action against Meta. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

93.     **Numerosity**: The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. There are many thousands of members of each class and subclass. The precise number of class and subclass members is unknown to Plaintiffs but may be ascertained from Meta's books and records and through expert proof. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

94.     **Community of Interest**: The class has a shared community of interest because this action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

      (a)     Whether Meta engaged in the conduct described in this complaint;

(b)      Whether Meta obtained billions in profits unjustly enriching itself by profiting from the tortious endangerment of children;

(c)      Whether Meta deliberately markets its products to children;

(d)      Whether Meta knowingly permits children under thirteen to use its products;

(e)      Whether Meta's age and identity verification requirements are grossly inadequate;

(f)      Whether Meta misrepresented the features of its products, particularly its safety tools;

(g)      Whether Meta structured its products to include variable and intermittent rewards similar to a slot machine;

(h)      Whether Meta's products inflict social comparison and other related harms;

(i)      Whether pre-adolescents are uniquely vulnerable to the harms created by Meta's products; and

(j)      Whether Plaintiffs are entitled to damages and injunctive relief.

95.      **Typicality**: Plaintiffs' claims are typical of the other class and subclass members' claims because, among other things, all class and subclass members were comparably injured through Meta's wrongful conduct as described above.

96.      **Adequacy**: Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the classes and subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The classes and subclasses interests will be fairly and adequately protected by Plaintiffs and their counsel.

97.      **Substantial Benefit**: A class action will provide substantial benefits to the class members compared to any other available means for the fair and efficient adjudication of this controversy, and no

unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiffs and the other class or subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Meta, so it would be impracticable for the members of the Classes to individually seek redress for Meta's wrongful conduct. Importantly, this action does not seek recovery for damages for personal injury—it is focused on clearly distinct harms related to Meta's unjust enrichment, gender discrimination, and omissions and misrepresentations. Such injuries are not feasible to remedy through individual litigation. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I

### On Behalf of the Unjust Enrichment Subclass

### For Unjust Enrichment

98.     Plaintiffs incorporate ¶¶1-97 by reference.

99.     Meta was unjustly enriched because it received a benefit from Plaintiffs, understood it received a benefit from Plaintiffs, and did so in circumstances in which acceptance or retention of the benefit was inequitable.

100.    The benefit Meta received was in the form of user time by minors spent on its product and engagement with its product, which is valuable to Meta because Meta's profits from advertisements are inextricably linked to user engagement with its platform.

101.    Unlike a billboard, where an advertiser pays a set fee to display an advertisement in a particular place, regardless of whether anyone actually sees that advertisement, Meta only charges

advertisers for impressions (a user seeing an ad) and clicks (when a user clicks on an ad). The price of advertisements on Meta's products is set by a complex bidding process based on what users advertisers are targeting. In order to facilitate this structure, Meta retains extensive records of what advertisements by which advertisers were seen by what users and what Meta was paid for that advertisement.

102.    On information and belief, because of this structure, it is possible to identify through an analysis of Meta's records the amount of money Meta made from showing advertisements to class members, both as a whole and on an individual basis.

103.    Acceptance or retention of the benefit of minor time spent on its products (and the resulting profits) was inequitable because Plaintiffs were induced to spend time on Meta's platform through the tortious conduct described above. Plaintiffs and the nationwide punitive class members have an equitable right to the money that Defendant has reaped from advertisers that is superior to Defendant's claim.

104.    Defendant's algorithms induced Plaintiffs to develop addictive behaviors to Meta Products. These behaviors only created increased profits from Defendant based on user engagement.

105.    Every dollar derived from members of the unjust enrichment class was taken in violation of federal laws which exist to protect children under the age of thirteen from being exploited for profit. Every dollar derived from members of the unjust enrichment class was taken while knowingly putting children in harm's way. Plaintiffs and the nationwide class members have an equitable right to the money that Defendant has reaped from advertisers that is superior to Defendant's claim.

106.    Meta acted with knowledge of the underlying wrong to Plaintiffs or despite a known risk that the conduct in question violated the rights of Plaintiffs. It is thus liable for its net profits incurred as a result of its unjust enrichment.

**COUNT II**

**On Behalf of the Unruh Civil Rights Act Subclass**

**For Damages Under Unruh Civil Rights Act**

107.    Plaintiffs incorporate ¶¶1-97 by reference.

108.    The California Unruh Civil Rights Act provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex ... are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51.

109.    The Unruh Act prohibits arbitrary discrimination by businesses on the basis of specified classifications, including sex.

110.    "Sex includes, but is not limited to, a person's gender..." Cal. Civ. Code § 51(e)(5). Sex also "includes a perception that the person has any particular characteristic or characteristics within the listed categories or that the person is associated with a person who has, or is perceived to have, any particular characteristic or characteristics within the listed categories." Cal. Civ. Code § 51(e)(6).

111.    Defendant and its Meta Products are a "business establishment" within the meaning of the Act. Defendant is headquartered in California, and its primary purpose and goal in operating Meta is to conduct business, generate revenue, and earn profits. Defendant earns billions of dollars in revenues from its business activities conducted in California. The Unruh Act also applies to business services that are conducted wholly over the internet.

112.    Defendant has intentionally, knowingly, and purposefully engaged in discriminatory conduct by designing algorithms that discriminate against users on the basis of sex. These discriminatory algorithms deny users full and equal accommodations, advantages, facilities, privileges, or services of Meta Products by categorizing and segregating its users by gender.

113.    Meta violated the Unruh Act each and every time it discriminated based on gender while providing the Meta Products to Plaintiffs, including, but not limited to, each and every time it generated an algorithmic newsfeed.

114.    Pursuant to Cal. Civ. Code § 52(a), Plaintiffs seek monetary relief against Defendant of statutory damages in the amount of $4,000 per violation, or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

**COUNT III**

**On Behalf of the Colorado Consumer Protection Subclass**

**For Damages Under Colorado Consumer Protection Law**

115.    Plaintiffs incorporate ¶¶1-97 by reference.

116.    The Colorado Consumer Protection Act (Colorado CPA) prohibits deceptive practices in the course of a person's business, including but not limited to "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." Colo. Rev. Stat. § 6-1-105.

117.    Defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

118.    Plaintiffs and Colorado Class members are "consumers" for purposes of Col. Rev. Stat. § 6-1-113(1)(a).

119.    Each Defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

120.    Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs seek monetary relief against Defendant in the form of statutory damages in the amount of $500 for each class member or actual damages in an

amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

## COUNT IV

### On Behalf of the District of Columbia Consumer Protection Subclass

### For Damages Under District of Columbia Consumer Protection Law

121. Plaintiffs incorporate ¶¶1-97 by reference.

122. D.C. Code § 28-3904 forbids "any person to engage in an unfair or deceptive trade practice[.]"

123. Defendant is a "person" within the meaning of this statute.

124. Pursuant to D.C. Code § 28-3905(k)(1), Plaintiffs seek monetary relief against Defendant in the amount of $1,500 in statutory damages for each class member or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

## COUNT V

### On Behalf of the Hawaii Consumer Protection Subclass

### For Damages Under Hawaii Consumer Protection Law

125. Plaintiffs incorporate ¶¶1-97 by reference.

126. Hawaii Rev. Stat. § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

127. Each Defendant is a "person" under Hawaii Rev. Stat. § 480-1.

128. Plaintiffs and Hawaii Class members are "consumer[s]" as defined by Hawaii Rev. Stat. § 480-1, who purchased or leased the Polluting Vehicles at issue.

129.    Pursuant to Hawaii Rev. Stat. § 480-13, Plaintiffs seek monetary relief in the form of statutory damages of $1,000 for each class member or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

## COUNT VI

### On Behalf of the Idaho Consumer Protection Subclass

### For Damages Under Idaho Consumer Protection Law

130.    Plaintiffs incorporate ¶¶1-97 by reference.

131.    The Idaho Consumer Protection Act (Idaho CPA) prohibits deceptive business practices, including engaging in any unconscionable method, act or practice in the conduct of trade or commerce. Idaho Code Ann. § 48-603.

132.    Defendant is a "person" under Idaho Code Ann. § 48-602(1).

133.    Defendant's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. Idaho Code Ann. § 48-602(2).

134.    Pursuant to Idaho Code Ann. § 48-608, Plaintiffs seek monetary relief against each Defendant in the amount of $1,000 in statutory damages for each plaintiff or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

## COUNT VII

### On Behalf of the Indiana Consumer Protection Subclass

### For Damages Under Indiana Consumer Protection Law

135.    Plaintiffs incorporate ¶¶1-97 by reference.

136.    Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a person from engaging in a "deceptive business practice[s]."

137.    Defendant is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2).

138.    Plaintiffs' interactions with Facebook and Instagram are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

139.    Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs seek monetary relief against Defendant of statutory damages in the amount of $500 for each plaintiff or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

## COUNT VIII

### On Behalf of the Kansas Consumer Protection Subclass

### For Damages Under Kansas Consumer Protection Law

140.    Plaintiffs incorporate ¶¶1-97 by reference.

141.    The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a). Deceptive acts or practices include but are not limited to "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact" and "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." Kan. Stat. Ann. § 50-626.

142.    Plaintiffs and are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b).

143.    Plaintiffs' relationships with Facebook and Instagram are "consumer transactions" within the meaning of Kan. Stat. Ann. § 50-624(c).

144.    Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs seek monetary relief against Defendant of statutory damages in the amount of $10,000 for each plaintiff or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

### COUNT IX

**On Behalf of the Michigan Consumer Protection Subclass**

**For Damages Under Michigan Consumer Protection Law**

145.     Plaintiffs incorporate ¶¶1-97 by reference.

146.     Mich. Comp. Laws Ann. § 445.903 states that "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful," including "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have,"  "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is," and "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."

147.     Defendant is engaged in "the conduct of trade or commerce" within the meaning of this statute.

148.     Pursuant to Mich. Comp. Laws Ann. § 445.911, Plaintiffs seek monetary relief against Defendant of statutory damages in the amount of $250 for each plaintiff or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

**COUNT X**

**On Behalf of the New Hampshire Consumer Protection Subclass**

**For Damages Under New Hampshire Consumer Protection Law**

149.     Plaintiffs incorporate ¶¶1-97 by reference.

150.     The New Hampshire Consumer Protection Act prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including "but . . . not limited to, the following: . . . [r]epresenting that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality,

or grade, . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. § 358-A:2.

151.     Both Defendant and Plaintiffs are "persons" under N.H. Rev. Stat. § 358-A:1.

152.     Defendant's conduct occurred in the conduct of trade or commerce within the meaning of this statute.

153.     Pursuant to N.H. Rev. Stat. § 358-A:10, Plaintiffs seek monetary relief against Defendant of statutory damages in the amount of $1,000 for each plaintiff or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

## COUNT XI

### On Behalf of the New York Consumer Protection Subclass

### For Damages Under New York Consumer Protection Law

154.     Plaintiffs incorporate ¶¶1-97 by reference.

155.     The New York General Business Law (New York GBL) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

156.     Plaintiffs and New York Class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

157.     Defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

158.     Pursuant to N.Y. Gen. Bus. Law § 349, Plaintiffs seek monetary relief against Defendant of statutory damages in the amount of $50 for each plaintiff or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

## COUNT XII

**On Behalf of the Ohio Consumer Protection Subclass**

**For Damages Under Ohio Consumer Protection Law**

159.     Plaintiffs incorporate ¶¶1-97 by reference.

160.     Ohio Rev. Code Ann. § 1345.02 broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.

161.     Plaintiffs are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D) and their relationships with Facebook and Instagram are a "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

162.     Defendant is a "supplier" within the meaning of Ohio Rev. Code Ann. § 1345.01(C).

163.     Defendant's conduct constitutes an act or practice declared to be deceptive or unconscionable by rule and by the decisions of the courts of Ohio. Pursuant to Ohio Rev. Code Ann. § 1345.09, Plaintiffs seek monetary relief against Defendant of statutory damages in the amount of $200 for each plaintiff or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

**COUNT XIII**

**On Behalf of the Oklahoma Consumer Protection Subclass**

**For Damages Under Oklahoma Consumer Protection Law**

164.     Plaintiffs incorporate ¶¶1-97 by reference.

165.     The Oklahoma Consumer Protection Act declares unlawful, inter alia, the following acts or practices when committed in the course of business: making a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person" and "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Okla. Stat. Tit. 15, §§ 752–753.

166.     Plaintiffs are "persons" under Okla. Stat. Tit. 15, § 752.

167.     Defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. Tit. 15, § 751(1).

168.     Plaintiffs' relationships with Facebook and Instagram are a "consumer transaction" within the meaning of Okla. Stat. Tit. 15, § 752.

169.     Defendant's conduct occurred in the conduct of trade or commerce within the meaning of this statute.

170.     Pursuant to Okla. Stat. Tit. 15, § 761.1, Plaintiffs seek monetary relief against Defendant of statutory damages in the amount of $2,000 for each plaintiff or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

**COUNT XIV**

**On Behalf of the Utah Consumer Protection Subclass**

**For Damages Under Utah Consumer Protection Law**

171.     Plaintiffs incorporate ¶¶1-97 by reference.

172.     The Utah Consumer Sales Practices Act (Utah CSPA) makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including but not limited to indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not; indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not; and "indicat[ing] that a specific price advantage exists, if it does not." Utah Code Ann. § 13-11-4.

173.    Defendant knew, or had reason to know, that consumers would rely on its failure to disclose the defects in its Facebook and Instagram products. Defendant therefore engaged in an unconscionable act within the meaning of Utah Code Ann. § 13-11-5.

174.    Pursuant to Utah Code Ann. § 13-11-4, Plaintiffs seek monetary relief against Defendant of statutory damages in the amount of $2,000 for each plaintiff or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

## COUNT XV

**On Behalf of the Virginia Consumer Protection Subclass**

**For Damages Under Virginia Consumer Protection Law**

175.    Plaintiffs incorporate ¶¶1-97 by reference.

176.    The Virginia Consumer Protection Act (Virginia CPA) lists prohibited "practices," which include "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.

177.    Defendant is a "supplier" under Va. Code Ann.§ 59.1-198.

178.    Plaintiffs' relationships with Facebook and Instagram are a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

179.    Defendant willfully and knowingly misrepresented or used false promises as to the safety of Meta Products to Plaintiffs.

180.    Defendant also willfully and knowingly omitted material facts as the harmful nature of the content on Meta Products that were explicitly designed to target Plaintiffs' children.

181.    Pursuant to Va. Code Ann. § 59.1-204, and because Defendant's conduct was committed willfully and knowingly, Plaintiffs seek monetary relief against Defendant of statutory damages in the

amount of $1,000 for each plaintiff or actual damages in an amount to be proven at trial, as well as injunctive relief, attorneys' fees, and any other just and proper relief available under the law.

## PRAYER FOR RELIEF

Plaintiff requests that the Court, after trial on the merits, grant the following relief and judgment:

A.      Certification of each of the proposed classes and subclasses described above;

B.      Disgorgement of Meta's unjust enrichment to the unjust enrichment subclass;

C.      Damages, in the amount to be determined at trial, for the civil rights and state consumer protection subclasses, as well as appropriate injunctive relief;

D.      An award of costs and legal fees;

E.      Such other or further relief as may be appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: September 26, 2022


By: _____
SOCIAL MEDIA VICTIMS LAW CENTER
Laura Marquez Garrett (SBN 221542)
laura@socialmediavictims.org
1390 Market St, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Christopher A. Seeger (*pro hac vice* anticipated)
Christopher L. Ayers (*pro hac vice* anticipated)
Nigel P. Halliday (*pro hac vice* anticipated)
SEEGER WEISS LLP
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: 973-639-9100

Facsimile: 973-679-8656
cseeger@seegerweiss.com
cayers@seegerweiss.com
nhalliday@seegerweiss.com

Matthew P. Bergman (*pro hac vice* anticipated)
matt@socialmediavictims.org
Glenn Draper (*pro hac vice* anticipated)
glenn@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 741-4862
Facsimile: (206) 957-9549

Robert H. Klonoff (*pro hac vice* anticipated)
klonoff@usa.net
2425 S.W. 76th Ave.
Portland, Oregon 97225
Telephone: (503) 702-0218
Facsimile: (503) 768-6671