**BEFORE THE UNITED STATES**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION / PERSONAL INJURY PRODUCT LIABILITY LITIGATION** | **MDL No. 3047** |

**BRIEF IN RESPONSE TO MOVANT'S MOTION FOR TRANSFER OF ACTIONS**
**PURSUANT TO 28 U.S.C. § 1407**

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 3

    A.    47 Cases Filed by Eight Law Firms Are Pending Against Meta and Other Defendants in 26 Federal Courts Across the Country. ............................................ 3

    B.    There Are Cross-Cutting Legal and Fact Issues Among the Actions. ................... 4

    C.    The Actions Are in Early Stages of Litigation......................................................... 6

    D.    The Parties Have Not Been Able to Agree on an Alternative to Centralization. ........................................................................................................... 6

LEGAL STANDARD....................................................................................................... 7

ARGUMENT .................................................................................................................... 7

I.    CENTRALIZATION IS JUSTIFIED TO EXPEDITE THE EFFICIENT RESOLUTION OF CROSS-CUTTING ISSUES. ............................................................ 7

    A.    A Phased, Centralized Proceeding Will Create Efficiencies. ................................ 7

        1.    Threshold legal issues are appropriate for resolution at the motion to dismiss stage. ........................................................................................ 8

        2.    General causation issues are appropriate for early consideration............. 11

    B.    All Four Defendant Groups Should Be Included in any MDL. ............................ 14

II.    CENTRALIZATION SHOULD OCCUR IN THE EASTERN OR WESTERN DISTRICT OF KENTUCKY, OR ALTERNATIVELY IN THE MIDDLE DISTRICT OF FLORIDA OR NORTHERN DISTRICT OF GEORGIA, BUT NOT IN MOVANT'S HAND-PICKED COURTS.......................................................... 16

    A.    Centralization Would Be Appropriate in the Eastern or Western Districts of Kentucky, or Alternatively in the Middle District of Florida or Northern District of Georgia. ................................................................................................ 16

    B.    The Actions Should Not Be Centralized in the Movant's Proposed Jurisdictions or the Northern District of California. ............................................. 19

CONCLUSION............................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In Re: Amazon.com, Inc., Fulfillment Center Fair Labor Standards Act (FLSA)
and Wage and Hour Litigation*,
3:14-md-02504-DJH, ECF 315 (W.D. Ky. Aug. 9, 2022)......................................................17

*In re: AndroGel Prod. Liab. Litig.*,
24 F. Supp. 3d 1378 (J.P.M.L. 2014)...................................................................................12

*In re: Bard IVC Filters Prod. Liab. Litig.*,
122 F. Supp. 3d 1375 (J.P.M.L. 2015).................................................................................20

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011)..............................................................................................................10

*In re: Camp Lejeune, N. Carolina Water Contamination Litig.*,
763 F. Supp. 2d 1381 (J.P.M.L. 2011)...................................................................................8

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ..................................................................................................... *passim*

*Doe v. MySpace*,
528 F.3d 413 (5th Cir. 2008) .................................................................................................9

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) ...............................................................................................9

*E. Coast Test Prep LLC v. Allnurses.com, Inc.*,
971 F.3d 747 (8th Cir. 2020) ...........................................................................................9, 21

*E-ventures Worldwide, LLC v. Google, Inc.*,
2017 WL 2210029 (M.D. Fla. Feb. 8, 2017) .......................................................................10

*Est. of B.H. v. Netflix, Inc.*,
2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ........................................................................11

*In re: Fluoroquinolone Prod. Liab. Litig.*,
122 F. Supp. 3d 1378 (J.P.M.L. 2015)............................................................................12, 16

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019)................................................................................................9, 21

*Franklin v. X Gear 101, LLC*,
2018 WL 3528731 (S.D.N.Y. July 23, 2018) ........................................................................9

*G.G. v. Salesforce.com, Inc.*,
  2022 WL 1541408 (N.D. Ill. May 16, 2022) ........................................................... 9

*Herrick v. Grindr LLC*,
  765 F. App'x 586 (2d Cir. 2019) ............................................................................. 9

*In re Int'l House of Pancakes Franchise Litig.*,
  331 F. Supp. 556 (J.P.M.L. 1971) ........................................................................... 8

*In re Intel Corp. Microprocessor Antitrust Litig.*,
  403 F. Supp. 2d 1356 (J.P.M.L. 2005) .................................................................. 19

*Intellect Art Multimedia, Inc. v. Milewski*,
  2009 WL 2915273 (N.Y. Sup. Ct. Sept. 11, 2009) ................................................ 11

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) ................................................................................. 11

*In re Jan. 2021 Short Squeeze Trading Litig.*,
  2021 WL 1258399 (J.P.M.L. Apr. 2, 2021) ........................................................... 14

*In re: Jiffy Lube Int'l, Inc., Text Spam Litig.*,
  802 F. Supp. 2d 1367 (J.P.M.L. 2011) .................................................................. 16

*Jones v. Dirty World Ent. Recordings LLC*,
  755 F.3d 398 (6th Cir. 2014) ................................................................................... 9

*Kimzey v. Yelp!, Inc.*,
  836 F.3d 1263 (9th Cir. 2016) ................................................................................. 9

*Langdon v. Google, Inc.*,
  474 F. Supp. 2d 622 (D. Del. 2007) ...................................................................... 10

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
  227 F. Supp. 3d 452 (D.S.C. 2017) ....................................................................... 14

*Miami Herald Publ'n Co. v. Tornillo*,
  418 U.S. 241 (1974) ................................................................................................. 9

*In re Mirena IUD Prod. Liab. Litig.*,
  713 F. App'x 11 (2d Cir. 2017) ......................................................................... 2, 12

*In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*,
  249 F. Supp. 3d 1357 (J.P.M.L. 2017) .................................................................. 12

*In re Nat'l Hockey League Players' Concussion Inj. Litig.*,
  49 F. Supp. 3d 1350 (J.P.M.L. 2014) .................................................................... 19

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ...................................................................9

*NetChoice, LLC v. Att'y Gen. of Fla.*,
    34 F.4th 1196 (11th Cir. 2022) ..............................................................10

*NetChoice, LLC v. Paxton*,
    573 F. Supp. 3d 1092 (W.D. Tex. 2021)................................................10

*O'Handley v. Padilla*,
    2022 WL 93625 (N.D. Cal. Jan. 10, 2022) ............................................10

*Obado v. Magedson*,
    612 F. App'x 90 (3d Cir. 2015) ...............................................................9

*In re Onglyza (Saxagliptin) & Kombiglyze XR (Saxagliptin & Metformin) Prod.
Liab. Litig.*,
    2022 WL 3050665 (E.D. Ky. Aug. 2, 2022).........................1, 12, 13, 17

*In re Paragard IUD Prod. Liab. Litig.*,
    510 F. Supp. 3d 1376 (J.P.M.L. 2020)...................................................18

*In re: Protegrity Corp. & Protegrity USA, Inc., Pat. Litig.*,
    84 F. Supp. 3d 1380 (J.P.M.L. 2015)...................................................7, 8

*Quinteros v. InnoGames*,
    2022 WL 898560 (W.D. Wash. Mar. 28, 2022) ...................................11

*Ramirez v. Bank of Am., N.A.*,
    2022 WL 2313151 (N.D. Cal. June 15, 2022) .......................................20

*Rodgers v. Christie*,
    795 Fed. App'x 878 (3d Cir. 2020).........................................................11

*In re: Roundup Prod. Liab. Litig.*,
    214 F. Supp. 3d 1346 (J.P.M.L. 2016)...................................................12

*In re: Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*,
    978 F. Supp. 2d 1379 (J.P.M.L. 2013)...................................................19

*Search King, Inc. v. Google Tech., Inc.*,
    2003 WL 21464568 (W.D. Okla. May 27, 2003) .................................10

*In re: Sigg Switzerland (USA), Inc., Aluminum Bottles Mktg. & Sales Pracs.
Litig.*,
    682 F. Supp. 2d 1347 (J.P.M.L. 2010)...................................................18

*In re Sorin 3T Heater-Cooler Sys. Prod. Liab. Litig. (No. II)*,
    289 F. Supp. 3d 1335 (J.P.M.L. 2018)............................................................12, 18

*In re Sw. Life Ins. Co. Sales Pracs. Litig.*,
    268 F. Supp. 2d 1377 (J.P.M.L. 2003)........................................................................19

*In re Tasigna (Nilotinib) Prod. Liab. Litig.*,
    555 F. Supp. 3d 1363 (J.P.M.L. 2021)..................................................................2, 11, 18

*In re TJX Companies, Inc.*,
    505 F. Supp. 2d 1379 (J.P.M.L. 2007)........................................................................16

*United States v. Sampson*,
    2016 WL 11726919 (D. Mass. Sept. 2, 2016) ..............................................................14

*United States v. Weis*,
    891 F. Supp. 2d 1007 (N.D. Ill. 2012) ........................................................................14

*Vaughn v. Hobby Lobby Stores, Inc.*,
    2021 WL 2008469 (W.D. La. May 19, 2021) ..............................................................13

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*,
    424 F. Supp. 3d 781 (N.D. Cal. 2020) ....................................................................2, 12, 13

*In re: Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.*,
    224 F. Supp. 3d 1330 (J.P.M.L. 2016)..................................................................7, 13, 15

*In re Viagra (Sildenafil Citrate) Prod. Liab. Litig.*,
    176 F. Supp. 3d 1377 (J.P.M.L. 2016)........................................................................12

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*,
    3:16-MD-02691, ECF 1021 (N.D. Cal. April 8, 2020)....................................................12, 13

*In re Zantac (Rainitidine) Prod. Liab. Litig.*,
    437 F. Supp. 3d 1368 (J.P.M.L. 2020)......................................................................2, 12

*Zhang v. Baidu.com, Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014)............................................................................10

## Statutes

28 U.S.C. § 1407..................................................................................................1, 2, 6, 7, 8

47 U.S.C. § 230(c)(1)....................................................................................................8

## Other Authorities

*Black's Law Dictionary* (11th ed. 2019)........................................................................10

Fed. R. Evid. 702 ..........................................................................................................6, 13

Fed. R. Civ. P. 1 ...............................................................................................................8

Restatement (Third) of Torts: Products Liability § 19(a) (1998) ................................10

## INTRODUCTION

Meta Platforms, Inc. owns and operates the Facebook and Instagram apps.  Since January, Plaintiffs have filed nearly 50 lawsuits nationwide against Meta and other online service providers (the "Actions"), alleging that Defendants' apps are addictive and caused them harm. For the reasons set out below, coordination of these cases under 28 U.S.C. § 1407 is proper.

Although there are many individualized differences among the Actions that would otherwise counsel against an MDL, coordination is appropriate here chiefly because it will allow for the efficient resolution of cross-cutting threshold issues.  Several of these issues are suitable for early resolution on a motion to dismiss, including:  (1) whether Plaintiffs' claims are barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230"), which provides immunity to interactive computer service providers for the alleged adverse effects of third-party content posted on their sites; (2) whether the First Amendment bars the claims because they challenge Meta's editorial control and judgment, including content policies and practices; and (3) whether Plaintiffs' core claims that social media apps are "defective products" fail because product liability laws extend only to "tangible" goods, not intangible services like Defendants' apps.

Even if these threshold motions do not dispose of all the claims, coordination is proper because the cases also raise threshold issues of causation.  For example, there is a cross-cutting question of general causation that is capable of resolution on motions under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)—*i.e.*, whether the use of Defendants' apps can cause the kind of injuries Plaintiffs allege, a showing Plaintiffs must make for these cases to proceed. Phasing discovery to focus first on this question of general causation—as was done in several recent MDLs—would "promote the just and efficient conduct of such actions."  28 U.S.C. § 1407(a).  *See, e.g.*, *In re Onglyza (Saxagliptin) & Kombiglyze XR (Saxagliptin & Metformin)*

*Prod. Liab. Litig.*, 2022 WL 3050665, at \*14 (E.D. Ky. Aug. 2, 2022); *In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prod. Liab. Litig.*, 424 F. Supp. 3d 781, 799 (N.D. Cal. 2020); *In re Mirena IUD Prod. Liab. Litig.*, 713 F. App'x 11, 14 (2d Cir. 2017).   Indeed, this Panel has cited cross-cutting "issues of general causation" as a reason for centralizing cases in many other cases. *See, e.g.*, *In re Tasigna (Nilotinib) Prod. Liab. Litig.*, 555 F. Supp. 3d 1363, 1365 (J.P.M.L. 2021); *In re Zantac (Rainitidine) Prod. Liab. Litig.*, 437 F. Supp. 3d 1368, 1369 (J.P.M.L. 2020).

Although Meta agrees centralization is proper, Movant's presentation of two hand-picked judges from the federal judiciary—neither of whom is presiding over any of the Actions—does not comport with the spirit of Section 1407.  If the Panel creates an MDL, the proceedings should be assigned to a judge in a centrally located district with pending cases and favorable docket conditions.  The Eastern and Western Districts of Kentucky fit these criteria: both districts are located centrally to the Actions and two such cases are pending there; there is only one MDL in each district (each of which may soon be resolved); and weighted filings per judgeship are low.  Alternatively, an MDL could reasonably be sent to the Middle District of Florida or the Northern District of Georgia, both of which have pending cases, are equally convenient to the parties and counsel, and are suitable based on Movant's chosen metric for docket conditions.

Finally, given that the Actions are pled to include use by individual Plaintiffs of multiple Defendants' applications, any MDL should include claims against all Defendants named in these Actions.  Any other configuration would not achieve the efficiencies that are the objective of the MDL framework.

## BACKGROUND

### A.    47 Cases Filed by Eight Law Firms Are Pending Against Meta and Other Defendants in 26 Federal Courts Across the Country.

Beginning in early 2022, newly-formed law firm Social Media Victims Law Center ("SMVLC") filed 21 lawsuits against various combinations of Meta[1]; TikTok Inc. and ByteDance Inc. (together "TikTok"); YouTube, LLC, Google LLC and Alphabet Inc. (together "Google"); and Snap Inc. (collectively, "Defendants"), alleging that Defendants' apps are "unreasonably dangerous" and "defective products" that caused "social media addiction." *E.g.*, *White*, ECF 1 ¶¶ 13, 108.  Seeger Weiss has appeared as counsel in many of the lawsuits filed by SMVLC. *E.g.*, ECF 16-1.

Beginning in June 2022, another law firm, Beasley Allen, filed 19 similar lawsuits against Meta.  In Movant's motion to transfer, Beasley Allen notes that it "represents over 400 clients prepared to bring similar claims against Defendants."  ECF 1 ¶ 11.

Since then, the law firm Morgan & Morgan has filed seven lawsuits against Meta, the law firm Bruster PLLC has filed one lawsuit against Meta, Snap, and TikTok, and three law firms — Aylstock, Witkin, Kreis & Overholtz, PLLC, Hach Rose Schirripa & Cheverie LLP, and Marsh Law Firm PLLC—have jointly filed one lawsuit against Meta and Snap, all pending in federal court.

Altogether, these eight firms have filed or appeared in 47 lawsuits against Meta and other online providers that are now pending in 26 federal courts located in 10 different circuits. Seventeen of the Actions—over one-third—include more than one Defendant, and some cases include all Defendants. *E.g.*, *M.C.*, ECF 1 at 1 (N.D. Cal.).  Even in single-Defendant cases,

---

[1] Some Plaintiffs have sued Meta subsidiaries Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, and Siculus, Inc.

apps operated by other Defendants may be relevant to the claims of the individual Plaintiffs in those cases.  For example, Plaintiffs have alleged that all of Defendants' apps are widely used by minors who gain access to Defendants' apps without their parents' knowledge, making it difficult to know which apps they used.  *E.g. M.C.*, ECF 1 ¶¶ 30, 288; *Aranda*, ECF 1 ¶¶ 148, 166.  It stands to reason, then, that even in single-Defendant cases, many of the Plaintiffs used more than one of Defendants' apps.

Although 16 cases have been filed in the Northern District of California (primarily by SMVLC and Seeger Weiss), Plaintiffs in the cases filed to date primarily reside in the Eastern United States, with no current Plaintiffs living in the Northern District of California (or anywhere else in California).[2]  Indeed, only one Plaintiff resides west of Colorado (in Oregon).[3] Counsel for the parties—including the five sets of Plaintiffs' counsel who filed the Actions, other counsel who have appeared in those Actions and in this proceeding (*e.g.*, Seeger Weiss), and the four sets of defense counsel—span the country.

### B. There Are Cross-Cutting Legal and Fact Issues Among the Actions.

The Actions present multiple factual and legal differences—including that they involve four groups of defendants, five online apps, more than ten alleged design defects involving unique features, a wide variety of alleged injuries (ranging from body dysmorphia to depression), and scores of messages from third parties to Plaintiffs on varied topics (*e.g.*, seeking explicit

---

[2] *See Rodriguez*, ECF 67 ¶ 9 (Plaintiff is a resident of Connecticut); *Spence*, ECF 1 ¶ 55 (New York); *Heffner*, ECF 1 ¶ 16 (Tennessee); *Seekford*, ECF No. 1 ¶ 21 (Virginia); *Aranda*, ECF 1 ¶ 56 (Louisiana); *Roberts*, ECF 1 ¶ 62 (Louisiana); *Martin*, ECF 1 ¶ 57 (Kentucky); *Wuest*, ECF 1 ¶ 60 (Kentucky); *M.C.*, ECF 1 ¶ 59 (Louisiana); *Flatt*, ECF 1 ¶ 55 (Tennessee); *Mitchell*, ECF No. 1 ¶ 56 (Florida); *T.K.*, ECF 1 ¶ 63 (Tennessee); *T.R.* ECF 1 ¶ 36 (Kentucky); *C.C.*, ECF No. 1 ¶ 57 (Louisiana); *J.H.*, ECF 18 ¶ 18 (Texas); *D.H.* ECF 1 ¶ ("resides outside the State of California"); *L.A.T.*, ECF 1 ¶ 52 (Louisiana).

[3] *See Doffing*, ECF 1 ¶ 11.

photos or posting violent content).  Still, the cases all concern the same core theory, *i.e.*, that Defendants' apps allegedly cause addiction, are used by third parties to post "content to children," allegedly lack "safeguards from harmful and exploitative content," and, because of all these factors, allegedly caused a sweeping range of alleged harm that would not have occurred but for use of the apps.  *E.g.*, *M.C.*, ECF 1 ¶¶ 1, 78–79, 143, 279–83.

This theory implicates at least three threshold legal defenses that will need to be resolved at the outset of any MDL.  First, Plaintiffs' claims are barred by Section 230, which prohibits holding interactive computer service providers like Defendants liable for the harmful effects of third-party content.  Second, Plaintiffs' claims are barred by the First Amendment because they challenge Defendants' content policies and practices used to organize and display third-party content.  The First Amendment prohibits forcing content providers to adopt or enforce particular content policies or practices.  Third, Defendants' apps are intangible communications services used to transmit ideas and other content—akin to streaming services and other forms of media— and are not "products" for purposes of product liability law.

Plaintiffs' claims also raise cross-cutting questions of general causation, *i.e.*, whether it can reliably be determined through expert testimony that the apps—as opposed to a host of other factors—caused the injuries Plaintiffs allege.  Those questions include (1) whether the apps can produce a psychological condition that Plaintiffs refer to as "social media addiction," *White*, ECF 1 ¶ 37, (2) whether the apps can be a factual cause of Plaintiffs' injuries through either "social media addiction" or some other psychological mechanism, and (3) whether the apps can reliably be determined to cause the full range of injuries Plaintiffs allege, from anorexia nervosa to PTSD to myriad other mental health conditions, *e.g.*, *Wuest*, ECF 1 ¶ 193; *Dorsey*, ECF 1 ¶ 65, when every Plaintiff experiences a range of life experiences and varying exposure to different types of

media and technology aside from Defendants' apps.  Plaintiffs acknowledge the novelty of the causation theory they propose:  their precursor claim of "social media addiction" is not recognized by the DSM-5, the psychiatric manual that "is used by mental health professionals to diagnose mental disorders."  *See, e.g.*, *Wuest*, ECF 1 ¶ 256.  Early resolution of whether Plaintiffs can carry their burden of demonstrating the validity of their admittedly untested causation theory consistent with the requirements of Fed. R. Evid. 702 will similarly advance the interests of efficiency embodied in 28 U.S.C. § 1407(a).

**C.    The Actions Are in Early Stages of Litigation.**

All of the Actions are in their very early stages.  No answers have been filed in any case, no Rule 12 motions have been fully briefed in any case,[4] and nothing more than limited discovery in a single stayed case has occurred.  No Rule 16(b) conferences have been held, and no general case management orders have been entered in any of the Actions.  Of the 47 cases noticed for inclusion in this proceeding, 32 have been stayed, with stay motions on file or soon to be filed in the remaining 15.

**D.    The Parties Have Not Been Able to Agree on an Alternative to Centralization.**

SMVLC and Beasley Allen—the two plaintiff firms that have filed most of these suits— initially took the position that these cases could be managed and coordinated informally, and Meta sought to informally coordinate with them on such issues as discovery and Rule 26(f) conferences.  The parties did not succeed in efforts to coordinate informally across the cases. Movant then filed the instant motion for centralization.

---

[4] Defendants moved to dismiss in one case but it was stayed before any opposition was filed.

## LEGAL STANDARD

This Panel may centralize civil cases for coordinated pretrial proceedings when: (1) the cases "involv[e] one or more common questions of fact," (2) transfer will further "the convenience of parties and witnesses," and (3) transfer "will promote the just and efficient conduct of such actions."  28 U.S.C. § 1407(a).

## ARGUMENT

## I.   CENTRALIZATION IS JUSTIFIED TO EXPEDITE THE EFFICIENT RESOLUTION OF CROSS-CUTTING ISSUES.

Given the cross-cutting issues discussed below, centralization in one proceeding would promote the just and efficient resolution of these Actions.  In particular, if Plaintiffs' claims survive a motion to dismiss, threshold scientific issues of general causation will be left to resolve at the *Daubert* and then summary judgment stages.  To achieve the efficiency that would justify an MDL, all Defendants should be included in any MDL.

### A.   A Phased, Centralized Proceeding Will Create Efficiencies.

Centralizing these cases will promote their just and efficient conduct.  Despite the substantial individualized issues that each case presents, *see* Background Part B, there are cross-cutting legal issues that could efficiently be addressed in a centralized action at the motion to dismiss stage, *In re: Protegrity Corp. & Protegrity USA, Inc., Pat. Litig.*, 84 F. Supp. 3d 1380, 1381 (J.P.M.L. 2015) ("Further, centralization will eliminate the potential for inconsistent rulings on several pending motions to dismiss . . . ."), and at the *Daubert* and summary judgment stages, *see In re: Viagra (Sildenafil Citrate) and Cialis (Tadalafil) Prod. Liab. Litig.*, 224 F. Supp. 3d 1330, 1332 (J.P.M.L. 2016) (recognizing efficiencies gained by the transferee court's decision "to structure pretrial proceedings in the MDL to focus on general causation as a threshold issue").

Here, centralization would allow the transferee Court to resolve core threshold legal issues warranting dismissal and to phase the litigation if a motion to dismiss is denied or denied in part.  Recognizing that the Panel will defer to the transferee Court on how to structure the MDL, guidance from the Panel on reasons for coordination will assist the transferee Court in formulating a plan most consistent with the goals of Rule 1—*i.e.*, "to secure the just, speedy, and inexpensive determination of every action and proceeding."  Fed. R. Civ. P. 1.

### 1.   Threshold legal issues are appropriate for resolution at the motion to dismiss stage.

One goal of centralization is to "eliminate the potential for inconsistent rulings," including on legal questions.  *In re: Protegrity Corp. & Protegrity USA, Inc., Pat. Litig.*, 84 F. Supp. 3d at 1381 (centralization warranted to "eliminate the potential for inconsistent rulings on several pending motions to dismiss"); *In re: Camp Lejeune, N. Carolina Water Contamination Litig.*, 763 F. Supp. 2d 1381, 1382 (J.P.M.L. 2011) (allowing individual courts to rule on pending motions to dismiss "only invites inconsistent rulings, a result that Section 1407 is designed to avoid").  Considerable efficiencies would be gained in this case by allowing the transferee Court to address at the outset at least three cross-cutting legal issues that apply to the four defendant groups.  And while those threshold issues are being adjudicated, the transferee Court is empowered to stay or phase discovery.  *See In re Int'l House of Pancakes Franchise Litig.*, 331 F. Supp. 556, 557 n.2 (J.P.M.L. 1971) ("Of course, the transferee judge may consider any 'threshold questions' before proceeding with substantive discovery.").

a.   *Section 230*.  Section 230 provides immunity to interactive computer service providers like Defendants from liability for alleged harms resulting from third-party content posted on their apps.  47 U.S.C. § 230(c)(1).  This immunity is broad, protecting "providers of interactive computer services against liability arising from content created by third parties."  *See,*

*e.g.*, *E. Coast Test Prep LLC v. Allnurses.com, Inc.*, 971 F.3d 747, 752 (8th Cir. 2020) (internal marks omitted).[5] Based on Plaintiffs' own allegations, they seek to hold Meta liable for injuries allegedly caused by third-party content. *E.g.*, *Martin*, ECF 1 ¶ 171 (third-party content promoting eating disorders); *Gill*, ECF 1 ¶¶ 227, 243 (third-party content promoting self-harm); *Heffner*, ECF 1 ¶ 87 (third-party content promoting firearms). As myriad courts have held, including in cases against Meta, claims of this nature are barred by Section 230. *See, e.g.*, *Force v. Facebook, Inc.*, 934 F.3d 53, 71 (2d Cir. 2019) (Facebook app); *Franklin v. X Gear 101, LLC*, 2018 WL 3528731, at *19 (S.D.N.Y. July 23, 2018) (Instagram app), *report and recommendation adopted*, 2018 WL 4103492 (S.D.N.Y. Aug. 28, 2018).[6]

      b.     *First Amendment.* The First Amendment prohibits holding Meta liable for exercising its "editorial control and judgment." *Miami Herald Publ'n Co. v. Tornillo*, 418 U.S.

---

[5] *See also, e.g.*, *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1269–70 (9th Cir. 2016) (no liability for users' starred reviews even though Yelp provided the feature allowing users to select a star rating); *Obado v. Magedson*, 612 F. App'x 90, 93–94 (3d Cir. 2015) (Section 230 protection extends to "situations where an interactive service provider makes decisions 'relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role'"); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (immunity covers claims based on decisions about "whether to publish, withdraw, postpone or alter content" (internal marks omitted)); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256-57 (4th Cir. 2009) (Section 230 protects website's "structure and design" where it does not contribute to alleged illegality of content).

[6] *See also Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019) (failure to warn claim barred by Section 230 because it was "inextricably linked to Grindr's alleged failure to edit, monitor, or remove … offensive content"); *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) (Section 230 barred claim based on "emails and push notifications" of third-party content); *Doe v. MySpace*, 528 F.3d 413, 416, 419–20 (5th Cir. 2008) (Section 230 bars claims seeking to hold social media company liable "for decisions relating to the monitoring, screening, and deletion of content from its network," including claims that company "failed to implement basic safety features" (internal marks omitted)); *G.G. v. Salesforce.com, Inc.*, 2022 WL 1541408, at *7 (N.D. Ill. May 16, 2022) (granting motion to dismiss claims seeking to hold defendant "responsible for the existence of third-party content").

241, 258 (1974).  As the Eleventh Circuit recently recognized, an app's content moderation policies are "closely analogous to the editorial judgments" made by organizations or entities that host third-party speech, such as "parade organizers and cable operators," as their algorithms and other features are used to organize and display speech provided by others.  *NetChoice, LLC v. Att'y Gen. of Fla.*, 34 F.4th 1196, 1213–14 (11th Cir. 2022).  Indeed, an unbroken line of cases has held that the First Amendment protects algorithmic content moderation on the internet.[7]  For that reason, Meta cannot be liable as the designer of algorithms that select and display third-party content—such as "images of excessively thin models," *Wuest*, ECF 1 ¶ 177—any more than a movie theater could be liable for trauma caused to a child from watching a scary movie.  *See, e.g.*, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794–95 (2011) ("No doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed." (internal citation omitted)).

      c.    *Definition of "Product."*  Product liability claims apply only to "products," which must be *tangible—i.e.*, "[h]aving or possessing physical form" or "[c]apable of being touched and seen."  *Black's Law Dictionary* (11th ed. 2019); Restatement (Third) of Torts: Products Liability § 19(a) (1998) ("A product is tangible personal property distributed commercially for use or consumption.").  Just as intangible goods like movies, music, books, and video games are not "products"—and just as movie theaters and booksellers cannot be liable for "defectively" curating such works—Defendants cannot be liable for displaying content on intangible

---

[7] *See, e.g.*, *O'Handley v. Padilla*, 2022 WL 93625, at *14 (N.D. Cal. Jan. 10, 2022); *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1106 (W.D. Tex. 2021), *injunction restored*, 142 S. Ct. 1715 (2022); *E-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *4 (M.D. Fla. Feb. 8, 2017); *Zhang v. Baidu.com, Inc.*, 10 F. Supp. 3d 433, 436–40 (S.D.N.Y. 2014); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629–30 (D. Del. 2007); *Search King, Inc. v. Google Tech., Inc.*, 2003 WL 21464568, at *3–4 (W.D. Okla. May 27, 2003).

communications services through the use of algorithms.  *See, e.g.*, *Rodgers v. Christie*, 795 Fed. App'x 878, 879–80 (3d Cir. 2020) ("an 'algorithm' or 'formula'" or the presentation of "'information, guidance, ideas, and recommendations'" are not "tangible personal property" and thus "are not 'products'"); *James v. Meow Media, Inc.*, 300 F.3d 683, 701 (6th Cir. 2002) ("video game cartridges, movie cassettes, and internet transmissions" are "not sufficiently 'tangible' to constitute products in the sense of their communicative content."); *Est. of B.H. v. Netflix, Inc.*, 2022 WL 551701, at \*3 (N.D. Cal. Jan. 12, 2022) (same for streaming show). Indeed, courts have held that mobile apps and websites, in particular, are not "products." *Quinteros v. InnoGames*, 2022 WL 898560, at \*1, 7 (W.D. Wash. Mar. 28, 2022) (dismissing claim against creator of allegedly "psychologically addictive" "mobile app" game because it was "not a product"); *Intellect Art Multimedia, Inc. v. Milewski*, 2009 WL 2915273, at \*7 (N.Y. Sup. Ct. Sept. 11, 2009) (a "website [that] is a forum for third-party expression" is a "'service'").

## 2.    General causation issues are appropriate for early consideration.

If Plaintiffs' complaints survive a motion to dismiss, all of the Actions will involve at least one threshold disputed question: whether Defendants' online apps can be deemed to be the cause of the sweeping range of harms Plaintiffs allege, whether by causing "social media addiction" or otherwise.  *E.g.*, *M.C.*, ECF 1 ¶¶ 341–42 (alleging "social media addiction" caused by use of "Facebook, Instagram, YouTube, Snapchat, and TikTok").  For Plaintiffs to proceed on this question, they will need to show, as a threshold matter, that their alleged injuries could be sufficiently connected to Defendants' apps as opposed to a host of other life circumstances and exposure to other media generally.  This showing would require them to introduce reliable expert testimony establishing a causal link between the apps and the types of harm that they allege.

The Panel has frequently invoked this cross-cutting question of general causation to justify creating an MDL.  *See, e.g.*, *In re Tasigna (Nilotinib) Prod. Liab. Litig.*, 555 F. Supp. 3d

1363, 1365 (J.P.M.L. 2021) ("issues of general causation" and other issues "appear to be sufficiently complex to justify centralization"); *In re Zantac (Ranitidine) Prod. Liab. Litig.*, 437 F. Supp. 3d 1368, 1369 (J.P.M.L. 2020) ("General causation issues, in particular, likely will be common across all the actions and would benefit greatly from coordinated treatment."); *In re Sorin 3T Heater-Cooler Sys. Prod. Liab. Litig. (No. II)*, 289 F. Supp. 3d 1335, 1337 (J.P.M.L. 2018) (same); *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 249 F. Supp. 3d 1357, 1361 (J.P.M.L. 2017) (same); *In re Viagra (Sildenafil Citrate) Prod. Liab. Litig.*, 176 F. Supp. 3d 1377 (J.P.M.L. 2016) (same); *In re: Roundup Prod. Liab. Litig.*, 214 F. Supp. 3d 1346, 1348 (J.P.M.L. 2016) (same); *In re: Fluoroquinolone Prod. Liab. Litig.*, 122 F. Supp. 3d 1378, 1379 (J.P.M.L. 2015) (same); *In re: AndroGel Prod. Liab. Litig.*, 24 F. Supp. 3d 1378, 1379 (J.P.M.L. 2014) (same).

Where general causation is a cross-cutting issue, centralization allows the MDL court to maximize efficiency by phasing both discovery and the adjudication of general causation issues in the pretrial phase. *See, e.g.*, *In re Mirena IUD Prod. Liab. Litig.*, 713 F. App'x 11, 14 (2d Cir. 2017) (phasing based on general causation and excluding plaintiffs' general causation expert opinions at the *Daubert* stage, resulting in summary judgment in favor of defendants); *In re Onglyza (Saxagliptin) & Kombiglyze XR (Saxagliptin & Metformin) Prod. Liab. Litig.*, 2022 WL 3050665, at *14 (E.D. Ky. Aug. 2, 2022) (same); *In re Viagra/Cialis*, 424 F. Supp. 3d 781, 799 (N.D. Cal. 2020) (same).

For example, in *In re Viagra/Cialis*, the Panel centralized fourteen cases alleging that Viagra caused melanoma, including because the cases had cross-cutting issues of "general causation." *In re Viagra*, 176 F. Supp. 3d at 1378. After centralization, the district judge "structured pretrial proceedings in the MDL to focus on general causation as a threshold issue,"

and this Panel transferred further cases to the MDL, including cases involving Cialis, a drug

developed by a different defendant, because the "the general causation questions presented by

[actions involving both drugs] are complex, and involve many of the same studies." *In re

Viagra/Cialis.*, 224 F. Supp. 3d at 1331–32.  The court then decided this scientific question at the

*Daubert* stage, excluded plaintiffs' general causation expert, and granted summary judgment for

defendants.  *In re Viagra/Cialis*, 424 F. Supp. 3d 781, 799 (N.D. Cal. 2020); *In re Viagra/Cialis*,

3:16-MD-02691, ECF 1021 at 2 (N.D. Cal. April 8, 2020).

Similarly here, Plaintiffs' allegation that Defendants' apps caused a host of injuries,

including through purported "social media addiction," presents a threshold scientific issue that

should be litigated early in the case, before other issues.[8]  To prove their theory, Plaintiffs will

need to proffer reliable expert testimony on general causation.  *In re Onglyza*, 2022 WL

3050665, at *7 (surveying state law and noting that "'all jurisdictions require expert testimony

[to prove general causation] at least where the issues are medically complex and outside common

knowledge and lay experience'" (quoting *In re Lipitor (Atorvastatin Calcium) Mktg., Sales

Pracs. & Prod. Liab. Litig.*, 227 F. Supp. 3d 452, 469 (D.S.C. 2017)).  Yet there are serious

questions of whether Plaintiffs will have reliable expert support for their novel causation theory.

For example, as Plaintiffs acknowledge, "social media addiction" is not recognized by the DSM-

5, *see* Background Part B, raising questions about Plaintiffs' ability to marshal reliable expert

opinion that will withstand review under Fed. R. Evid. 702.  *See Vaughn v. Hobby Lobby Stores,

Inc.*, 2021 WL 2008469, at *8 (W.D. La. May 19, 2021) (excluding expert diagnosis because it

"does not follow the DSM-5 criteria and therefore lacks scientific methodology, rendering it

---

[8] Insofar as there are unique causes of action brought by individual plaintiffs, those claims are
likewise subject to causation challenges and do not change the fact that ***every plaintiff*** is
asserting some type of claim that requires a showing of general causation.

unfounded and unreliable"); *United States v. Sampson*, 2016 WL 11726919, at *18 (D. Mass. Sept. 2, 2016) (excluding expert diagnosis of psychopathy because "Psychopathy is not a disorder listed in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition"); *United States v. Weis*, 891 F. Supp. 2d 1007, 1011 (N.D. Ill. 2012) (excluding diagnosis of "Self-Defeating Personality Disorder" because there is insufficient support for it in either (i) the DSM or (ii) "the scientific literature").

An MDL therefore would allow for the efficient resolution of core threshold issues—including whether there is reliable expert testimony on general causation linking Defendants' apps to the 20-plus different injuries that Plaintiffs allege—by empowering the transferee Court to phase the litigation to address those issues before the Court and parties devote resources to resolution of other issues.[9]

## B. All Four Defendant Groups Should Be Included in any MDL.

Finally, to achieve the efficiency that would justify an MDL, centralization must include every Defendant. That is because there are threshold issues common to all Defendants across all of the Actions (*see* Part I.A), because more than one-third of the cases involve multiple Defendants (*see* Background Part A), because even single-Defendant Actions likely involve apps operated by other Defendants (*id.*), and because splitting up the cases by "named defendant is

---

[9] Meta strongly disagrees with the allegations in the various complaints and will vigorously dispute them in these Actions. For example, some Plaintiffs have alleged that statements in internal company documents demonstrate a causal link between Meta's apps and certain outcomes. *E.g.*, *M.C.*, ECF 1 ¶ 7. Plaintiffs have not fairly characterized those documents, and moreover, cannot meet their burden of establishing causation in complex proceedings like these without proffering reliable expert testimony. *See supra* at 13; *see also, e.g.*, *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 227 F. Supp. 3d at 469 ("[T]he argument that party-opponent admissions can substitute for expert evidence is a recent and novel one created by plaintiffs in multi-district litigations where expert evidence has been excluded under *Daubert*.").

impracticable and would undermine the efficiencies to be obtained through centralized pretrial proceedings." *In re Jan. 2021 Short Squeeze Trading Litig.*, 2021 WL 1258399, at *3 (J.P.M.L. Apr. 2, 2021).  To provide just one illustration of the way in which claims can be intertwined across Defendants, one recent case was brought by a parent on behalf of two children, asserting claims for one child relating to Facebook and YouTube, and claims regarding a second child regarding TikTok and YouTube.  *See L.A.T.*, ECF 1 ¶¶ 201, 228.

Any attempt to split up cases by Defendant would create at least one of two practical problems.  *First*, if all multiple-Defendant actions were excluded from the MDL, then seventeen cases—and any future multiple-Defendant cases—would proceed separately, without the benefit of coordination, notwithstanding their shared factual and legal premises.  That would result in needless duplication of effort and potentially inconsistent rulings across each of those cases and the MDL—including inconsistent rulings on Meta-specific issues (such as *Daubert* motions involving Meta's expert witnesses).  *Second*, were certain Defendants severed from the current Actions, individual Plaintiffs who used multiple Defendants' apps would be forced to litigate claims across multiple suits, creating inefficiencies.  Severance would also present significant administrative challenges around the proper apportionment of any damages where a single plaintiff used multiple apps.

In addition to avoiding these practical problems, an MDL that includes all Defendants would result in efficiencies insofar as cross-cutting questions could be addressed as to all Defendants in a single MDL proceeding, avoiding inconsistent rulings across cases.  *E.g.*, *In re Viagra/Cialis*, 224 F. Supp. 3d at 1332 (centralizing claims concerning different drugs and defendants because "the actions likely will involve overlapping discovery concerning many of the same scientific studies, common expert witness issues, and duplicative pretrial motions").

## II.   CENTRALIZATION SHOULD OCCUR IN THE EASTERN OR WESTERN DISTRICT OF KENTUCKY, OR ALTERNATIVELY IN THE MIDDLE DISTRICT OF FLORIDA OR NORTHERN DISTRICT OF GEORGIA, BUT NOT IN MOVANT'S HAND-PICKED COURTS.

### A.   Centralization Would Be Appropriate in the Eastern or Western Districts of Kentucky, or Alternatively in the Middle District of Florida or Northern District of Georgia.

In cases in their early stages that are "geographic[ally] dispers[ed]," this Panel typically selects a district that (i) "is not burdened by many MDLs and has the capacity and resources to successfully guide this litigation" and (ii) provides an accessible and "geographically central location for parties, witnesses, and counsel." *In re: Bard IVC Filters Prod. Liab. Litig.*, 122 F. Supp. 3d 1375, 1377 (J.P.M.L. 2015) (centralizing in district that "is not burdened by many MDLs and has the capacity and resources to successfully guide this litigation"); *In re TJX Companies, Inc.*, 505 F. Supp. 2d 1379, 1380 (J.P.M.L. 2007) ("[W]e have sought a transferee district that is centrally located for the parties, and a transferee judge with the time and experience to steer this litigation on a prudent course."); *In re: Jiffy Lube Int'l, Inc., Text Spam Litig.*, 802 F. Supp. 2d 1367, 1368 (J.P.M.L. 2011) (centralizing in district that is "relatively convenient for parties, witnesses and counsel").

To determine whether a district has the capacity to handle an MDL, the Panel should look to whether it has low "weighted filings per judgeship."  That metric is the gold standard used by the Judicial Conference to determine burden in a district, including whether a district should be given additional judgeships and whether a "judicial emergency" exists in that district.[10]

---

[10] *Judiciary Seeks New Judgeships, Reaffirms Need for Enhanced Security*, U.S. Courts (accessed Aug. 30, 2022), https://www.uscourts.gov/news/2021/03/16/judiciary-seeks-new-judgeships-reaffirms-need-enhanced-security; *Judicial Emergency Definition*, U.S. Courts (accessed Aug. 30, 2022), https://www.uscourts.gov/judges-judgeships/judicial-vacancies/judicial-emergencies/judicial-emergency-definition.

There are several jurisdictions with pending cases that have excellent weighted filings per judgeship and are centrally located for the parties, witnesses, and counsel.  Among those are the Eastern District of Kentucky and the Western District of Kentucky, where two cases are pending. These districts are excellent candidates for centralization.  Only one MDL is pending in each.[11] All but one of the MDL cases in the Western District of Kentucky has been resolved,[12] and that case has been stayed pending a mediation.[13]  And summary judgment was recently granted in the Eastern District of Kentucky MDL.[14]  Both jurisdictions enjoy excellent docket conditions based on the "weighted filings per judgeship" metric, with 295 and 340 weighted filings per judgeship in the Eastern and Western Districts, respectively.[15]  These conditions are superior to those in the districts suggested by Movant (the Western District of Missouri hosts 6 MDLs with 473 weighted filings per judgeship, and the Northern District of Illinois hosts 16 MDLs with 366 weighted filings per judgeship), and superior as well to the Northern District of California, where the highest number of Actions is pending (17 MDLs and 699 weighted filings per judgeship).

Alternatively, the Middle District of Florida and Northern District of Georgia (where four cases are currently pending) benefit from a relatively low number of MDLs and enjoy excellent

---

[11] *MDL Statistics Report - Distribution of Pending MDL Dockets by District (August 15, 2022)*, U.S. Courts, *available at* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-August-15-2022.pdf.

[12] *Id.*

[13] *In Re: Amazon.com, Inc., Fulfillment Center Fair Labor Standards Act (FLSA) and Wage and Hour Litigation*, 3:14-md-02504-DJH, ECF 315 (W.D. Ky. Aug. 9, 2022).

[14]  *In re Onglyza*, 2022 WL 3050665, at *14.

[15] *U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (June 30, 2022)*, U.S. Courts, *available at* https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2022/06/30-2.

docket conditions based on Movant's "median time from filing to disposition of a civil case" metric.[16]  The Middle District of Florida has 2 MDLs and a median time to civil disposition of 6.6 months and the Northern District of Georgia has 4 MDLs with a median time to civil disposition of 5.0 months.[17]  By contrast, there are 16 MDLs and a median time to civil disposition of 7.2 months in the Northern District of Illinois, 6 MDLs and a median time to civil disposition of 7.3 months in the Western District of Missouri, and 17 MDLs and a median time to civil disposition of 10.1 months in the Northern District of California.[18]

Each of Meta's four proposed districts is reasonably accessible, as this Panel has previously recognized.  *See In re Onglyza (Saxagliptin) & Kombiglyze XR (Saxagliptin & Metformin) Prod. Liab. Litig.*, 289 F. Supp. 3d 1357, 1359 (J.P.M.L. 2018) (E.D. Ky. is "a relatively accessible district"); *In re: Sigg Switzerland (USA), Inc., Aluminum Bottles Mktg. & Sales Pracs. Litig.*, 682 F. Supp. 2d 1347, 1349 (J.P.M.L. 2010) (same for W.D. Ky.); *In re Tasigna (Nilotinib) Prod. Liab. Litig.*, 555 F. Supp. 3d 1363, 1365 (J.P.M.L. 2021) (same for

---

[16] That metric is less instructive than the weighted filings per judgeship metric because it does not reflect a district's *current* capacity to handle cases, but instead reflects how long the district took to decide cases *previously* pending before it.  *See* Explanation of Selected Terms, U.S. Courts, *available at* https://www.uscourts.gov/sites/default/files/explanation-selected-terms-district-march-2012_0.pdf.  Because this metric is inherently retrospective, it can cause districts to appear more or less congested than they actually are.  For example, if a district disposes of many older cases in one year, the district's "median time from filing to disposition of a civil case" will increase for that year, even though the disposition of those cases may result in increased capacity (and thus decreased weighted filing per judgeship).  This phenomenon appears in the Judicial Caseload Profile for the Northern District of Texas, which terminated many old cases in 2022, resulting in an increase in "median time from filing to disposition of a civil case," but a decrease in the "weighted filings per judgeship."

[17] *U.S. District Courts–Combined Civil and Criminal Federal Court Management Statistics (June 30, 2022)*, U.S. Courts, *available at* https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2022/06/30-2.

[18] *Id.*

M.D. Fla.); *In re Paragard IUD Prod. Liab. Litig.*, 510 F. Supp. 3d 1376, 1378 (J.P.M.L. 2020) (same for N.D. Ga.).  They are also centrally located for many of the Plaintiffs, five of whom live in Kentucky (with another 12 residing in surrounding states), and 29 of whom reside in the Southern United States.  *See In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 49 F. Supp. 3d 1350, 1350 (J.P.M.L. 2014) (centralizing in District of Minnesota because that district is close to Canada, and thus "provides a geographically central location for parties and witnesses" located there).[19]  Finally, these districts are also reasonably convenient for counsel, who span the nation.  *See In re Intel Corp. Microprocessor Antitrust Litig.*, 403 F. Supp. 2d 1356, 1357 (J.P.M.L. 2005) (centralizing in district that is "geographically convenient for many of this docket's litigants and counsel").

**B.      The Actions Should Not Be Centralized in the Movant's Proposed Jurisdictions or the Northern District of California.**

Plaintiff has proposed centralizing cases before a specific judge in either the Northern District of Illinois or the Western District of Missouri, even though neither of those judges is presiding over any of the Actions.  Meta does not believe that the MDL Judge should be selected from a two-judge list proposed by any party, especially when those judges have no ties to any Action, when they sit in jurisdictions with multiple MDLs and heavier caseloads (as noted above), and when there are over 35 judges currently presiding over the Actions.

Because Meta is in the Northern District of California, that district hosts the largest number of Actions, but far short of a majority of cases.  The number of pending actions also

---

[19] *See also In re: Schnuck Markets, Inc., Customer Data Sec. Breach Litig.*, 978 F. Supp. 2d 1379, 1381 (J.P.M.L. 2013) (transferring to Eastern District of Missouri, where one case was pending, because, *inter alia*, "several plaintiffs also reside in this district"); *In re Sw. Life Ins. Co. Sales Pracs. Litig.*, 268 F. Supp. 2d 1377, 1378 (J.P.M.L. 2003) (transferring case to Northern District of Texas, including because "several plaintiffs reside in Texas").

should not drive the choice of district.  As an initial matter, no Plaintiff lives in the Northern District of California (or anywhere in California); indeed, only one Plaintiff resides west of Colorado.  *See supra* at 4.  But more importantly, the docket conditions in the Northern District of California counsel against centralizing an MDL of this size there.  The Northern District of California has 17 MDLs pending—tied for the most MDLs in the country.[20]  That district also has a weighted filings per judgeship of 699, over twice the weighted filings per judgeship as the Eastern District of Kentucky.  *See supra* at 17.  Indeed, due to "increased case volumes, COVID-19 backlogs, limited resources, and judicial vacancies," the Northern District of California "is currently in a judicial emergency."  *Ramirez v. Bank of Am., N.A.*, 2022 WL 2313151, at *7 n.7 (N.D. Cal. June 15, 2022).[21]  Given the availability of districts that are central to the parties and have superior docket conditions, centralization in one of those districts would create more efficiencies.  *See In re: Bard IVC Filters Prod. Liab. Litig.*, 122 F. Supp. 3d at 1377.

## CONCLUSION

For the above reasons, Meta does not oppose centralization, but respectfully requests the cases be transferred to the Eastern or Western District of Kentucky or, alternatively, the Middle District of Florida or Northern District of Georgia.

---

[20] *MDL Statistics Report - Distribution of Pending MDL Dockets by District (August 15, 2022)*, U.S. Courts, *available at* https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-August-15-2022.pdf.  Meta is a party in one of these MDLs, involving class actions where the location of the Defendant carries greater relative weight than in personal injury actions.

[21] *See also Judicial Emergencies*, U.S. Courts (accessed August 30, 2022), https://www.uscourts.gov/judges-judgeships/judicial-vacancies/judicial-emergencies (identifying three judicial vacancies in the Northern District of California as "judicial emergencies).

Dated: August 30, 2022

Respectfully submitted,

*/s/ Phyllis A. Jones*
Phyllis A. Jones
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-5868
pajones@cov.com

*Counsel for Defendants Meta Platforms, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, and Siculus, Inc.*